## IN THE MATTER OF HARVEY PRAGER.

Suffolk. October 3, 1995. - February 15, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, O'CONNOR, GREANEY, & FRIED, JJ.

*Attorney at Law,* Admission to practice. *Supreme Judicial Court,* Membership in the bar. *Practice, Civil,* Membership in the bar.

Discussion of the standard of rehabilitation of a convicted felon required to establish the necessary good moral character for his admission to the Massachusetts bar, with reference to the standard of rehabilitation required for reinstatement after disbarment. [91-95]

An applicant for admission to the Massachusetts bar did not establish at this time that, since his convictions in January, 1988, of Federal felonies relating to the smuggling of large quantities of marihuana into the United States, he was fully rehabilitated and had become "a person proper to be held out by the court to the public as trustworthy," where seven years of a creditable work history, successful completion of law school, and compliance with the terms of a five-year probationary period were insufficient to show good moral character when balanced against approximately sixteen years of marihuana use, international smuggling and living as a fugitive: however, the applicant was free to petition for admission to the bar five or more years hence. [95-100] O'CONNOR, J., dissenting.

This court set forth guidelines to the Board of Bar Examiners and to applicants for the bar with respect to character inquiries. [100-102]

PETITION filed in the Supreme Judicial Court for the county of Suffolk on June 13, 1994.

The case was reported by *Abrams,* J.

*Michael E. Mone* for the petitioner.

*Nancy E. Kaufman,* Assistant Bar Counsel.

*Scott Harshbarger,* Attorney General, *Thomas H. Green & Edward V. Colbert,* Assistant Attorneys General, for the Attorney General, amicus curiae, submitted a brief.

LIACOS, C.J. On June 13, 1994, Harvey Prager applied for admission to the bar of the Commonwealth. The Board of Bar Examiners (board) held a hearing on his application and on January 6, 1995, reported to this court, pursuant to G. L.

c. 221 § 37 (1994 ed.),[1] that the applicant is of "good moral character and sufficient acquirements and qualifications and recommends his admission." On June 30, 1995, a single justice of this court reserved and reported the case to the full court for determination. Oral argument was held before the full court on October 3, 1995. At the invitation of the court, bar counsel appeared and took the position that the petition should be denied. We deny Prager's application for admission to the bar with leave to reapply in five years from the date of this opinion.

The record reveals the following facts.[2] Prager was born in 1947, the son of immigrants. He attended Bowdoin College from 1965 to 1969, where he was a member of Phi Beta Kappa and was graduated summa cum laude. From 1971 to 1972, Prager attended Harvard University as a graduate student. While at Harvard, it appears that he began smoking marihuana regularly, which he claims subsequently led him into the illegal sale and distribution of marihuana.[3] Over a

[1]General Laws c. 221, § 37 (1994 ed.), states in relevant part that "[a] citizen of the United States, if over eighteen, may file a petition in the supreme judicial court or superior court to be examined for admission as an attorney at law. Unless the court otherwise orders, the clerk of such court shall refer the petition to the board of bar examiners to ascertain his acquirements and qualifications. If the board reports that the petitioner is of good moral character and sufficient acquirements and qualifications and recommends his admission, he shall be admitted unless the court otherwise determines, and thereafter may practice in all the courts of the commonwealth."

[2]The record before this court consists primarily of Prager's application and petition for admission to the bar, letters submitted both favoring and opposing Prager's admission, and two documents recording Prager's guilty pleas. The record does not contain the sentencing judgment, which apparently contains the description of the special conditions of Prager's probation, nor does it contain the terms of Prager's modified probation or the original indictment. The facts surrounding Prager's conduct prior to his guilty plea in 1987 must be gleaned almost entirely from several newspaper articles, including one entitled "Unequal Justice," Times (Brunswick, Me.), Sept. 29, 1993. Prager stated at the hearing before the board that the content of the article was generally accurate.

[3]In 1972, it appears Prager was charged with unlawful possession of a controlled substance with intent to sell and larceny in Massachusetts. Both charges appear to have been later dismissed. The board did not request and did not have this information before it at the time of the hearing. The single justice of this court, when reserving and reporting the case, ordered Prager to include in the record appendix a certified copy of his criminal record apart from the Federal drug convictions.

period of approximately six years, Prager organized and led a large-scale international drug smuggling operation. Much of the marihuana smuggled into the country came by boat from South America into Maine, New York, and other points along the eastern coast of the United States. Over the course of Prager's dealings, he used several aliases, including "Jack," "John Stead," "Steven Shane," and "Jack Harvey."

Prager testified before the board that he stopped smoking marihuana in 1981, at which time he also ceased his smuggling operation. However, he continued to sell marihuana in the United States for two more years. In 1983, Prager was indicted by a Federal grand jury in the district of Maine. On learning of the indictment, Prager fled the country and lived as a fugitive until he was extradited from Great Britain in 1987. The record is sparse in relation to Prager's activities during the years before 1987. Following his flight from the United States, it appears he spent some time in the Caribbean, where he owned investment property presumably purchased with proceeds from his illegal activities. Also, he owned a $400,000 apartment in Paris, where he met and married his wife. He was known in London, under the name "Harvey Israel," as a reputable art dealer. In 1987, Scotland Yard was investigating a bank robbery when they came upon a safe deposit box identifying Harvey Israel as Harvey Prager. Prager remained incarcerated (in London and the United States) six months while awaiting extradition and trial.[4]

On January 29, 1988, Prager pleaded guilty to, inter alia, conspiracy to import into the United States a large quantity of marihuana, possession with intent to distribute a large quantity of marihuana, aiding and abetting the commission of this crime, and conspiracy to possess with intent to distribute in excess of 1,000 pounds of marihuana. He received a suspended sentence with probation for five years on special conditions of probation.[5] These conditions, which Prager helped negotiate, required Prager to reside and maintain

[4]There is some allusion in a letter opposing Prager's admission to the bar of the Commonwealth that Prager was allowed to retain $500,000 in return for providing to the United States authorities the identities of all persons he enlisted to participate in the smuggling operation. This is not verified by any documents found in the record.

[5]This document is not in the record before us. See note 2, *supra*. We rely for its substance on the letters and transcripts of testimony of the persons involved.

In the Matter of Prager.

employment in Maine, volunteer a minimum of forty-five hours each week toward assisting those with acquired immune deficiency syndrome (AIDS), and to create and maintain a free-standing hospice unit for persons in the terminal stages of AIDS.[6] Prager was unable to develop a free-standing hospice, due in part to his inability as a convicted felon to obtain Medicaid certification.[7] In 1989, the sentencing judge modified the terms of Prager's probation. Prager was to provide care in his home to AIDS patients in the terminal stages of the disease.[8]

In 1991, Prager sought and received permission from the Federal court to apply to the University of Maine School of

[6]Prager was also ordered to make restitution to the United States for the substantial profits gained from his illegal activities. The dollar amount of this restitution, and the percentage of profits it represents, are not clear from the record. The amount of illegally gained profits appears to be at least two million dollars. Prager testified he paid restitution of one hundred per cent of his profits, although it appears he kept an amount up to one-third of the approximately two million dollars. See *Matter of Pool*, 401 Mass. 460, 466 (1988) (restitution relevant to determination of rehabilitation). The record is silent as to how and when the income was earned. Prager's application for admission to the bar of the Commonwealth reveals only a summer job during college, managing a food stockroom for a resort hotel in 1965 and 1966.

[7]According to the Chief United States Probation Officer for the District of Maine, the hospice program's lack of success was attributable at least in part to internal division, "the direct result of some strong feelings that it was impossible for the organization to proceed with a convicted drug distributor (Prager) at the helm."

[8]It is suggested in the newspaper article that the court's modification of Prager's sentence included a reduction in the amount of required time spent with patients from forty-five hours a week to thirty hours. There is additional conflict regarding the quality of care given to Prager's patients, as well as regarding the number of patients for whom Prager actually cared. The terms of his probation required Prager to care for three patients at a time. It appears that at times there were no clients in the home, and it is unclear whether Prager ever accommodated more than two at one time. Prager testified that he cared for a total of fifteen patients over the course of his five-year probation. The space allocated to patient living in Prager's first home was apparently the basement. Prager moved in 1990 to a new home with adequate space for his endeavor.

The stepmother of one of Prager's clients testified in support of Prager's application, as did several nurses and one referring physician, each of whom worked with clients of Prager. A second physician and AIDS specialist, who originally participated in the creation of Prager's sentencing option, wrote the board in opposition to Prager's application, but declined to appear to testify at the board hearing.

Law. He enrolled as a full-time student in the fall of 1991. In Prager's absence, nurses cared for Prager's clients in his home during daytime hours. Prager was named to the dean's list in his first year, and was selected as a staff member on the Law Review. He worked for the Cumberland Legal Aid Clinic under the supervision of a professor of law. In 1993, Prager applied for and was accepted to a judicial clerkship for the Supreme Judicial Court of Maine.[9] In August, 1993, Prager was granted permission to complete his third year of law school as a student at Northeastern University School of Law in Massachusetts, and relocated the last of his AIDS clients out of his home in August, 1993. His probationary period ended on October 10, 1993. Prager graduated summa cum laude from the University of Maine School of Law in May, 1994. He began clerking for Associate Justice Howard H. Dana, Jr., in 1994.

Prager applied for admission to the Massachusetts bar in

[9]At this time Prager's criminal activity and perceived favored treatment by the United States District Court for the District of Maine became the subject of great publicity and attention in Maine. The article entitled "Unequal Justice," *supra*, outlined the perceived disparate treatment of Prager ("gentleman, scholar . . . released to the comfort of his Maine home to serve his sentence in a Victorian mansion with skylights and a harbor view") and Jim Henry, a struggling lobsterman from a poor family who assisted in two of Prager's smuggling operations in exchange for the promise of his own fishing boat. Henry surrendered after he learned of Prager's guilty plea and punishment. The same organization that helped craft Prager's sentence proposed to the court that Henry teach troubled youths marine science and fishing as a substitute for incarceration. The same judge who sentenced Prager refused Henry's alternative sentence. Instead, he sentenced Henry to nine years imprisonment, despite a prosecution request for from seven to eight years. Prager's other associates received sentences of from three to ten years. In response to questions about the disparity in sentences, Prager stated, "I don't think my sentence was easy. I think many people are angry that it did not include time in prison. And to the extent that it didn't include time in prison, it was easier than spending time in prison. On the other hand, most of my co-defendants, their prison time was spent in minimum security camps."

The article generated substantial media attention, resulting in many letters to both the Supreme Judicial Court of Maine and the board expressing outrage that Prager would be allowed to hold a prestigious clerkship or be admitted to the practice of law in Massachusetts. Prager did not apply for admission to the bar of Maine.

June, 1994. He sat for the bar examination in July, 1994.[10] Having passed the written examination, Prager was invited to appear at an oral interview before the board. A hearing, at which Prager testified, was held on December 22, 1994.[11] The board reported that "Prager has so rehabilitated himself since the time of his criminal activities thirteen years ago that he is of present good moral character," and recommended Prager's admission to the bar of the Commonwealth.

The license to practice law may not be withheld arbitrarily or discriminatorily. *Matter of an Application for Admission to the Bar of the Commonwealth*, 378 Mass. 795 (1979), cert. denied, 444 U.S. 1046 (1980). While deference is given to the decision of the board, this court retains ultimate authority to decide a person's fitness to practice law in the Commonwealth. G. L. c. 221, § 37. See *Matter of Allen*, 400 Mass. 417, 421 (1987); *Matter of Gordon*, 385 Mass. 48, 58 (1982). As with decisions of reinstatement after disbarment, the inquiry is one of public interest. "The question is not whether the respondent has been 'punished' enough. To make that the test would be to give undue weight to his private interests, whereas the true test must always be the public welfare." *Matter of Allen, supra* at 421, quoting *Matter of Keenan*, 314 Mass. 544, 547 (1943) (*Keenan II*).

A prior conviction is not an absolute bar to admission. We have stated that no offense is so grave as to preclude a showing of present moral fitness. *Matter of Allen, supra* at 421-422. *Matter of Hiss*, 368 Mass. 447, 452 (1975). The commission of a felony is, however, conclusive evidence of lack of

[10]Prager's application to the bar of the Commonwealth states that he intended to sit for the bar examination in the State of New York concurrently with Massachusetts. The record is silent as to whether he did in fact take the New York examination, whether he passed the examination, and whether he completed the character and fitness application in the State of New York. Bar counsel, at oral argument, stated that Prager is not now admitted to the practice of law in New York.

[11]Others who testified for Prager were Justice Dana of the Maine Supreme Judicial Court, Dr. Michael Bach who helped create Prager's alternative sentence, Prager's supervisor of his work at the Cumberland Legal Aid Clinic, and a member of the admissions committee of the University of Maine School of Law. The police chief of Portland, Maine, and a concerned citizen, neither of whom personally knew Prager, testified against his admission. The stepmother of a client of Prager's and a nurse who cared for another of Prager's clients for several months both testified on videotape to the quality of Prager's hospice services.

good moral character at the time of the offense. *Keenan II, supra* at 549. The test is whether at the present time the applicant has so rehabilitated himself by "[leading] a sufficiently exemplary life to inspire public confidence once again, in spite of his previous actions." *Matter of Hiss, supra* at 452. As stated by the board in the instant case, "the law rightfully requires us to focus upon the question of Prager's rehabilitation. The concept that human redemption is possible and valuable is both well established in law and premised upon longstanding, even ancient traditions." Thus, the issue before us is whether the applicant has sufficiently proved such rehabilitation that he currently possesses the necessary moral character to be admitted to the bar of the Commonwealth.[12]

As in a case of reinstatement after disbarment, the burden of showing good moral character after conviction of a felony is on the applicant. See Matter of MacKenzie, S.J.C. No. 81764 (December 22, 1983). See also *In re Cason*, 249 Ga. 806, 807-808 (1982); *In re Application of Davis*, 38 Ohio St. 2d 273, 275 (1974) (*Davis I*); *Matter of Jaffee*, 311 Or. 159, 163 (1991), s.c., 319 Or. 172 (1994); C.W. Wolfram, Modern Legal Ethics § 15.3.2, at 859 (1986) (discussing burden of proof in bar admission cases). This court has clearly established the standard of rehabilitation required for reinstatement after disbarment. "Whatever the offense for which a judgment of disbarment was entered, the person disbarred has a heavy burden on a subsequent petition for admission to the bar to overcome by evidence the weight of the facts adjudicated by such judgment and to establish affirmatively that since his disbarment he has become 'a person proper to be held out by the court to the public as trustworthy.' " *Matter of Hiss, supra* at 460-461, quoting *Matter of Keenan*, 313 Mass. 186, 219 (1943) (*Keenan I*). The factors to be considered in reinstatement hearings are as follows: "(1) the nature of the original offense for which the petitioner was disbarred, (2) the petitioner's character, maturity, and experience at the time of his disbarment, (3) the petitioner's occupations and conduct in the time since his disbarment, (4) the time elapsed since the disbarment, and (5) the petitioner's present competence in legal skills" (footnotes omitted). *Matter of Hiss, supra* at 460.

---

[12]The legal skills and qualifications of Prager are not in issue since no party contests these criteria.

The test of fitness for reinstatement is two pronged. Not only must a petitioner demonstrate the requisite moral qualifications and learning in the law, but he also must show that his resumption of the practice of law will not be detrimental to the integrity of the bar, the administration of justice, or the public interest. S.J.C. Rule 4:01, § 18 (5), as amended, 394 Mass. 1106 (1985). The rules governing original admissions to the bar, promulgated prior to development of the rules governing reinstatement, have no reference to the integrity of the bar or the public interest. See G. L. c. 221, § 37; S.J.C. Rule 3:01, § 1.3, as appearing in 382 Mass. 753 (1981). These directives set out a procedural scheme rather than substantive guidelines for bar admissions. Thus, it is appropriate, despite the lack of specific directives, to consider the public perception of and confidence in the bar when determining the fitness of original applicants to practice law in the Commonwealth. See ABA Code of Recommended Standards for Bar Examiners, Comprehensive Guide to Bar Admission Requirements (1995-1996) ("The primary purpose of character and fitness screening before admission to the bar is the protection of the public and the system of justice"). The protection of the public is universally recognized as a significant and central goal of admitting only qualified persons to the practice of a particular profession. See Rhode, Moral Character as a Professional Credential, 94 Yale L.J. 491, 507-512 (1985). Reinstatement "amounts to a certification to the public that the attorney is a person worthy of trust." *Matter of Gordon, supra* at 54, citing *Centracchio, petitioner,* 345 Mass. 342, 348 (1963). The allowance of an applicant's original admission to the bar is logically a similar endorsement that the applicant is worthy of the public trust. We would be remiss were we not to recognize the role of the public interest in these proceedings.

Although we have not enunciated clearly a quantum of proof necessary to prevail in a showing of good moral character by an applicant for original admission, we note that several jurisdictions require a showing of clear and convincing evidence where the applicant has been convicted of a felony. See *In re Cason, supra* at 808; *Matter of James G.,* 296 Md. 310, 314 (1983); *Matter of Strait,* 120 N.J. 477, 489 (1990); *In re Application of Davis,* 61 Ohio St. 2d 371, 372 (1980) (*Davis II*); *Matter of Rowell,* 305 Or. 584, 588 (1988).

But see *In re Manville*, 538 A.2d 1128, 1134 (D.C. 1988) (requiring showing by preponderance of the evidence). Authorities differ on whether those seeking to enter the profession have a lesser burden in showing moral fitness than those seeking reinstatement after disbarment. See *In re Sobin*, 649 A.2d 589, 592 (D.C. 1994) ("While a certain level of awareness as to the ethical obligations of a lawyer may be imputed to a third year, second semester law student . . . the same level of awareness, should not be attributed to a teenager who has not yet begun the study of law.") and Rhode, Moral Character as a Professional Credential, 94 Yale L.J. 491, 587 (1985) ("Attorney actions, unlike much applicant misconduct, cannot be discounted as remote in time or the product of youthful indiscretion. Moreover, violations of the law assume a different symbolic dimension when committed by those sworn to uphold it"). But see also *Matter of Jaffee, supra* at 163-164 ("We do not believe that an applicant for admission should be in a more favorable position than a similarly situated attorney applying for reinstatement") and McChrystal, A Structural Analysis of the Good Moral Character Requirement for Bar Admission, 60 Notre Dame L. Rev. 67, 73 (1984) ("When addressing the question of whether to admit an applicant who has engaged in misconduct, bar admission authorities and courts should be substantially guided by the treatment afforded admitted lawyers who engage in similar misconduct"). Just as this court has recognized that the burden of proving good moral character is heavier for one disbarred for the commission of a crime while a judge than while an attorney, see *Matter of Gordon, supra* at 57; *Centracchio, petitioner, supra* at 346, it may be that an applicant for original admission should be held to a more generous standard than a disbarred attorney seeking readmission. See Matter of MacKenzie, S.J.C. No. 81764 ("It may be that a petitioner has a lesser burden of proving fitness in a petition for original admission"). This court, however, has suggested that the standards for original admission and readmission after disbarment should be the same. See *id.* ("I have assumed the same standards apply"); *Keenan I, supra* at 218 ("a person who has been so removed from his office must meet the same high standard of good moral character for admission to the bar as is required to be met by a person who has never been admitted to the bar and consequently never been disbarred").

We conclude that the standard we have adopted in reinstatement proceedings is adequately amenable to the fitness inquiry of original applicants. The *Hiss* factors allow the court to balance circumstances surrounding the misconduct against the action the applicant has taken to show his rehabilitation. Such an approach better serves the interests of the public than would an inflexible quantum of proof requirement. We thus apply the *Hiss* factors to the inquiry whether a bar applicant has demonstrated the requisite rehabilitation since his crime.

It is appropriate to consider in a reinstatement proceeding the amount of time that has elapsed since the disbarment or suspension. An applicant to the bar, however, has not been the subject of a disbarment or suspension proceeding, and thus we must decide the date from which it is appropriate to commence measuring the time that has elapsed. The date here most closely analogous to the date a person might have been disbarred is the date of adjudication of the latest offense.[13] See *Matter of Jaffee, supra* at 165. Prager was indicted in 1983 and pleaded guilty to criminal charges in January, 1988. Prager does not benefit from the fact that his indictment occurred more than ten years ago. His flight from the country, for which he did not face prosecution, was none the less a wrong which continued until 1987. We consider then, whether Prager has established affirmatively that since his conviction in January, 1988, he "has become 'a person proper to be held out by the court to the public as trustwor-

---

[13]We decline to adopt a fixed number of years of good behavior required to establish the requisite fitness to practice law. We note, however, that a disbarred attorney must wait five years before applying for reinstatement. S.J.C. Rule 4:01 § 18 (1), as amended, 381 Mass. 791 (1980). Further, question eleven on the applicant's statement to the board inquires: "Have you been convicted anywhere within the last 7 years for conduct now deemed to be a felony in the jurisdiction where the judgment was rendered or within the last 5 years for conduct now deemed to be a misdemeanor in the jurisdiction where the judgment was rendered?" In declining to adopt a minimum or fixed time after which a convicted felon may seek admission to the bar, we stress that the public interest is best served by such decisions being made on a case-by-case basis, taking into account the totality of the circumstances. See *In re Sobin,* 649 A.2d 589, 591-592 (D.C. 1994); *In re Dileo,* 307 So. 2d 362, 364 (La. 1975) (rejecting five-year minimum waiting period). But see *Matter of Jaffee,* 311 Or. 159, 164-165 (1991), s.c., 319 Or. 172 (1994) (adopting five-year reinstatement rule to original admissions).

thy.' " *Matter of Hiss, supra* at 460-461, quoting *Keenan I, supra* at 219.

Prager's offenses were not minor. He not only participated in, but masterminded an international marihuana smuggling operation. He shipped eleven tons of marihuana into the United States. He enlisted others to carry out the day-to-day operations of this illegal enterprise. His smuggling operation spanned a period of approximately six years. It was large in scale and operated for profit. It was a freely chosen commercial venture, generating millions of dollars which Prager amassed in multiple countries. See *Centracchio, petitioner, supra* at 346-347 ("His improper practices were neither accidental nor casual, but were deliberate and planned in detail"). When he learned of his grand jury indictment, Prager became a fugitive from justice. He lived under various aliases. He admitted that, if his identity had not been accidentally discovered, he probably would not have returned to the United States. Although he states he was unhappy as a fugitive, "ultimately [he] lacked the courage to come back at that time in [his] life." Cf. *Matter of A.T.*, 286 Md. 507, 515 (1979) (allowing application, noting among other factors that "the applicant was a user and not a dealer in drugs").

Although not an attorney at the time, Prager's conduct was the product of neither inexperience nor immaturity. Prager's use and large scale sale and distribution of marihuana spanned a period in which Prager was in his mid-twenties to mid-thirties. He lived as a fugitive from justice for an additional four years, until the age of forty. He returned involuntarily and only when his true identity was discovered. Prager was, by his own admission, "mature enough and bright enough to have known better." His actions were not the result of economic or emotional necessity. He was well-educated and not without adequate resources to choose from a variety of paths of conduct. Prager's offenses were multiple, of lasting duration, deliberate, and motivated by personal gain. Cf. *Matter of Pool*, 401 Mass. 460, 467 (1988) (offenses committed eleven years earlier by "inexperienced practitioner confronting an unusual and complex criminal case"); *In re Sobin*, 649 A.2d 589, 590 (D.C. 1994) (guilty plea ten years earlier when applicant was twenty-one years old); *In re Application of G.L.S.*, 292 Md. 378, 397 (1982) (driver of getaway car in bank robbery was nineteen years old at time of

incident and convicted fourteen years prior to hearing); *Matter of James G.*, 296 Md. 310, 316 (1983) (criminal offenses occurred within a six-month period sixteen years prior to application, when applicant was twenty-one years of age); *In re Dileo*, 307 So. 2d 362, 364-365 (La. 1975) (applicant who committed two offenses at age twenty-one years within a one-month period — failing to pay a transfer tax on six ounces of marihuana and leaving the jurisdiction of probation without permission — admitted to the bar on conditions). As in the case of Wilfred B. Keenan, an attorney disbarred for bribing jury members, the applicant here "was mature in age and experience. . . . He was under no compelling necessity to do it. His act was not the result of sudden passion. It was deliberate. It required premeditation, a carefully formed plan, and continuance of a corrupt purpose long enough to carry that plan into effect." *Keenan II*, *supra* at 548.

The record shows that since Prager's conviction, he successfully completed the terms of his probation. He testified to the chastening effect working with those in the terminal stages of AIDS had on him. He has not been the subject of further criminal proceedings.[14] He successfully completed law school, and took and passed the Massachusetts bar examination. In the year following his graduation from law school, the same year in which these proceedings commenced, Prager clerked for the Supreme Judicial Court of Maine. While his employment record to date appears to be without blemish, we note that his work experience includes solely jobs of relatively short duration, mostly designed to further his own self-interest.[15] It does not appear that Prager has continued his work with AIDS patients in either Maine or in Massachusetts, despite his assertions to the board of his intent to continue to

[14]The record shows that Prager was the subject of a civil dispute in 1990, in which his landlord sought and was granted a judgment of forcible entry and detainer for possession of the property in which Prager operated the first hospice facility. Prager was apparently unable to leave the premises due to the refusal of a holdover tenant to vacate the premises into which Prager intended to move. The matter was settled by agreement of the parties. We give no weight to this aspect of his postconviction activities.

[15]The record before us was compiled while Prager was currently a law clerk to the Supreme Judicial Court of Maine. We assume, and have not been informed otherwise, that Prager completed his clerkship without incident. Counsel informed us at oral argument that Prager is currently working in his office as a legal researcher.

assist those in need. No other evidence has been presented to show Prager's present involvement in civic activities. Indeed, the seven-year period since his conviction has been spent almost entirely serving his sentence and achieving his law degree.[16] "[P]assage of time alone is insufficient to warrant [admission]." *Matter of Hiss, supra* at 460 n.19. It is premature at this time, given the severity and length of Prager's misbehavior, to conclude that Prager has shown he is now fully rehabilitated and worthy of the public trust. See *Matter of Gordon*, 385 Mass. 48, 51 (1982) (reinstatement of petitioner sixteen years after disbarment for larceny and conspiracy to commit larceny would be detrimental to integrity of the bar despite recommendation of Board of Bar Overseers to readmit); *Matter of Cappiello*, 416 Mass. 340, 344 (1993) (reinstatement allowed fifteen years after suspension and eleven years after disbarment where petitioner complied with terms of disbarment, established career as accountant, and engaged in numerous charitable activities); *Matter of Allen*, 400 Mass. 417, 423-425 (1987) (reinstatement allowed ten years after suspension where petitioner volunteered in house

[16]The Attorney General, in his amicus brief to the court, opposes the admission of Prager. He argues that we should count the lapse of time for the "period of time when the petitioner was a free man, able to conduct his affairs absent the court's supervision" to the date of his application for admission, a period of only eight months. Bar counsel's brief, submitted at the request of the court, states: "While fourteen years have elapsed since the petitioner gave up drug smuggling, it has been only five years since he surrendered to authorities and entered his guilty plea. Only two years have elapsed since the petitioner was released from probation. The petitioner spent the first year after probation finishing law school. The second year has been passed as a law clerk in the relatively sheltered environment of the Maine Supreme Judicial Court."

In the cases of *Matter of Allen*, 400 Mass. 417 (1987) (ten years); *Matter of Gordon*, 385 Mass. 48 (1983) (denied after sixteen years); *Matter of Hiss*, 368 Mass. 447 (1975) (twenty-three years), the petitioners' moral fitness was conceded and the only issue before the court was the effect of reinstatement on public confidence in the bar. *Matter of Keenan*, 314 Mass. 544 (1943) (denied after nine years) focuses on the detriment to public confidence in the bar even though the issue of moral fitness was before the court. *Matter of Cappiello*, 416 Mass. 340 (1993) (allowed eleven years after disbarment, thirteen years after temporary suspension); *Matter of Pool*, 401 Mass. 460 (1988) (allowed four years after disbarment where conduct occurred eleven years prior to disbarment); and *Centracchio, petitioner*, 345 Mass. 342 (1963) (denied after nine years, allowed after twenty-two years, where petitioner was a judge at time of misconduct) deal with both moral fitness and public confidence in the bar.

of correction as farm laborer, continued to work counseling inmates, served as de facto consul to India, and acted as chairman of executive committee of Indian government foundation); *Matter of Hiss, supra* at 462 (reinstatement allowed twenty-three years after disbarment).

We cannot say at this time that Prager's admission would not be detrimental to the integrity of the bar or the public interest. Prager's flight from the country undermined the integrity of judicial process. It is a wrong directly related to the practice of law and Prager's ability to act as an officer of the court. Additionally, although we cannot say that Prager was dishonest with the board or with this court, the absence in the record of information central to Prager's misconduct and rehabilitation creates some concern about his forthrightness. We are confident that Prager's admission at this time would reflect poorly on the integrity of the bar.

Prager presented numerous letters in his support from various persons associated with him. While we are impressed by the number of recommendations and the conviction of their authors, we are not persuaded by their pleas. Many of those writing on Prager's behalf have known Prager only a short time. Compare *Matter of Rowell*, 305 Or. 584, 590 (1988) ("Unlike most persons who provide references based solely on present knowledge, this judge is able to compare the applicant's previous and present character and note whether there indeed has been a change"). Other letters attest to Prager's compassion when dealing with AIDS patients in his care. We do not question that the work Prager did with those with AIDS was difficult and that Prager maintained true compassion for those he came to know. We do take into account, however, that Prager's work with AIDS patients constituted his alternative sentence, in the design of which he participated. We are not surprised that Prager would carry out his functions in a diligent manner, with the utmost respect and care for his patients. This is precisely what was required of him by his sentence. "Merely showing that an individual is now living as and doing those things he or she should have done throughout life, although necessary to prove rehabilitation, does not prove that the individual has undertaken a useful and constructive place in society. . . . The requirement of positive action is appropriate for applicants for admission to the bar because service to one's community is an implied

obligation of members of the bar." *In re Cason*, 249 Ga. 806, 808-809 (1982). We have given each letter, both for and against, its due weight in this consideration.

The applicant may be on a course of conduct conducive to a future finding of rehabilitation. We conclude, however, that seven years of a creditable work history, successful completion of law school, and compliance with the terms of a five-year probationary period, are insufficient to show good moral character when balanced against approximately sixteen years of marihuana use, international smuggling, and living as a fugitive. "Any significant doubts about an applicant's character should be resolved in favor of protecting the public by denying admission to the applicant." *Matter of Jaffee*, 319 Or. 172, 177 (1994). The applicant here was released from probation only two years ago. He applied for admission to the bar just eight months after the termination of his probationary period. This is not the case where "no purpose would be served by requiring a more extended demonstration of worthiness for admission." *In re Polin*, 630 A.2d 1140, 1142 (D.C. 1993) (admitting applicant six and one-half years after release from halfway house; first application rejected as four and one-half years from date of release insufficient time). The applicant is free to petition for admission to the bar in five or more years hence, at which time a more complete record of the applicant's activities since his conviction should be available, including his work history, any criminal involvement, and his contributions to society.

We feel it appropriate at this juncture to provide guidance on character inquiries to the board and to future applicants. It is the obligation of an applicant to assure the members of the board and, ultimately, this court that he or she possesses the necessary qualifications to practice law in the Commonwealth. Such a showing requires a full and exhaustive disclosure of prior wrongdoing, including all relevant circumstances surrounding the conduct, both militating and mitigating, and official documentation where appropriate. It requires the same vigorous disclosure with respect to relevant conduct since the wrongdoing, in order that a determination of rehabilitation may be openly and satisfactorily made. "A hearing to determine character and fitness should be more of a mutual inquiry for the purpose of acquainting this court with the applicant's innermost feelings and personal views on those

aspects of morality, attention to duty, forthrightness and self-restraint which are usually associated with the accepted definition of 'good moral character.' " *In re Application of Davis*, 38 Ohio St. 2d 273, 274 (1974). The approach should not be that of the adversarial nature of bar discipline cases, but rather should be one of cooperation by the applicant. *Id.*

The information provided by the applicant in the record must be sufficient to ensure that this court can independently assure the public that the applicant is trustworthy and "that the guilty person can . . . inspire the public confidence necessary to the proper performance of the duties of an attorney at law." *Matter of Keenan*, 314 Mass. 544, 549 (1943). Such an inquiry, where a hearing is held pursuant to G. L. c. 221, § 37, and S.J.C. Rule 3:01, § 5, as appearing in 411 Mass. 1321 (1992),[17] requires a thorough investigation into facts presented by the applicant as well as satisfaction that the applicant has indeed presented all material facts and supporting information.[18] It would be helpful to the court if the board should additionally make factual findings regarding the five factors enunciated in *Matter of Hiss, supra* at 460.

We said in *Matter of Keenan* (*Keenan II*), *supra* at 546-547, that:

> "The right to practise law is not one of the inherent rights of every citizen, as is the right to carry on an ordinary trade or business. It is a peculiar privilege granted and continued only to those who demonstrate special fitness in intellectual attainment and in moral character. All may aspire to it on an absolutely equal basis, but not all will attain it. Elaborate machinery has

[17]Supreme Judicial Court Rule 3:01 § 5, as appearing in 411 Mass. 1321 (1992), sets out the procedures for admitting those applicants found qualified and the dismissal of the petitions of those applicants found not qualified.

[18]The District of Columbia requires independent investigations of applicants who have committed felonies or other serious crimes, in all cases unless "the nature of the crime and the other surrounding circumstances, together with the other information concerning the applicant that comes to the [Committee on Admission's] attention, satisfy the Committee that an investigation would turn up no substantial adverse information." *In re Manville*, 538 A.2d 1128, 1133 (D.C. 1988). Although we decline to go so far, we commend the commitment to decide such applications for admission only on full and complete records of fact.

been set up to test applicants by standards fair to all and to separate the fit from the unfit. Only those who pass the test are allowed to enter the profession, and only those who maintain the standards are allowed to remain in it."

The public welfare demands that this court be certain that the "elaborate machinery" designed to ensure the standards of the profession fully operates. That machinery requires an applicant to the bar who has a criminal past strive diligently to overcome the burden he placed on himself when he violated the laws of the society he later seeks to uphold. Although we recognize rehabilitation when an applicant proves his changed character, the applicant has not done so here.

The petitioner's application is to be denied.

*So ordered.*

O'CONNOR, J. (dissenting). In *Matter of Gordon*, 385 Mass. 48, 58 (1982), a bar discipline case, the court observed, "We have given respect and close attention to the conclusions of the Board of Bar Overseers. The Board is dedicated to the public interest, as commissioned in the words of the rules of this court, and as demonstrated in the high standards of performance of the members of the Board in the several years of its existence." The same observation appropriately may be made regarding the Board of Bar Examiners (board). For that reason alone, significant weight should be accorded to the findings and recommendation of the board in this case. In addition, significant weight should be given to the findings of the board because the board, not the court, heard the testimony and observed the witnesses at the hearing on Prager's application. The board, "by virtue of this firsthand observation, is better able than a reviewing court to judge the relative credibilities of witnesses and to assign weight to the evidence they give." *Matter of Hiss*, 368 Mass. 447, 461 (1975). *Matter of Gordon, supra* at 55.

In its unanimous report, the board summarized Prager's criminal history, indictment, flight, six-months' incarceration while awaiting extradition and trial, guilty pleas and convictions. The board reported that, on conviction, Prager "was admitted to probation for a term of five years, upon special

conditions of probation which required him to open and operate a residential hospice care facility for AIDS sufferers in their terminal state. He was also required to make restitution to the United States for all of the substantial profits he had made from his illegal activities. In October, 1989, the United States District Judge (Gene Carter) determined after a hearing that, in spite of Prager's performance 'in every respect as the Court expected in attempting to bring about the opening of a hospice facility', he was unable to accomplish it. The Court stated: 'Indeed, it appears that his efforts in this regard have been the principal catalyst to the newly undertaken initiative to accomplish Medicare certification of AIDS patients in Maine.' Prager subsequently provided care to 15 AIDS patients in his own home."

The board's report continues:

"Testimony from a referring physician, two nurses who assisted him, the stepmother of one of his patients and a letter to the board from another nurse all clearly established that Prager's care of the patients was diligent, considerate, empathic and moving. Prager testified convincingly to the deep impression and chastening effect his experience had upon him.

"On October 10, 1993, Prager's probation period ended. The chief probation officer of the United States District Court wrote a lengthy letter to the board commending the 'extreme effort Prager had brought to his special conditions of probation', and concluded: 'Harvey Prager has complied with the sanctions imposed by our Court and redeemed his status as a responsible and highly productive citizen.' The Assistant United States Attorney who prosecuted the case wrote a lengthy letter describing his experiences with Prager, and concluded as follows: 'I am convinced that the Harvey Prager of the late 1970s and early 1980s is not the Harvey Prager who now desperately wants to contribute to society. In short, I am convinced that he has regained his moral rudder and now again is on the path of being an American success story. I believe that there can be justifiable faith in the Harvey Prager who is now husband, father and care provider.'

"Prager was given permission by Judge Carter to apply for admission to the University of Maine Law School. An Admissions Committee interviewed him and made extensive inquiries which resulted in a decision to admit him. The Chairperson

of the Admissions Committee testified before the board and recommended him. Letters were received from other faculty members and the Director of The Cumberland Legal Aid Clinic, where Prager was a student attorney providing services to indigent clients. In detailed descriptions of their experiences with Prager, they uniformly concluded with unqualified recommendations for his admission.

"Prager was selected by the Supreme Judicial Court of Maine to be one of its eleven law clerks. Justice Howard H. Dana, Jr. testified before the board to his unqualified confidence in Prager and to his opinion that he was of good moral character.

"As a result of Prager's selection to be a law clerk in Maine, he became the subject of widespread, constant notoriety. That, in turn, generated many letters to the board in opposition to his admission. While a few writers thought that his rehabilitation should be recognized, the vast majority of correspondents bitterly complained that his crime was unforgivable, that he had been given unfairly favorable treatment by Judge Carter, that he should not be favorably considered merely because of his outstanding academic record at Bowdoin College and at law school and that his admission would do great harm to the public image of the Bar of this Commonwealth.

"While the publicity engendered opposition letters, it did not result in the presentation to us by the correspondents, or by others of any factual evidence that would seriously bring into question the validity of the observations and recommendations of the chief probation officer, the federal prosecutor, the nurses who worked with him, the law school faculty members and Justice Dana. Those recommendations were reinforced by Prager's testimony before us.

"It is the unanimous opinion of the board of Bar Examiners that Prager has so rehabilitated himself since the time of his criminal activities thirteen years ago that he is of present good moral character. While we recognize and respect the force of the arguments presented to us that rehabilitation should not be the basis of our report, the law rightfully requires us to focus upon the question of Prager's rehabilitation. The concept that human redemption is possible and valuable is both well established in law and premised upon longstanding, even ancient traditions. The public interest would be ill-served if we refused to recognize rehabilitation when it

is adequately proved. Avoidance by us of making a judgment concerning rehabilitation would itself be an act which would tarnish the image of the Bar.

"We note that the law with respect to admissions to the Bar in Maine, both before and after the enactment of the 'Prager Act', c. 643, Second Regular Session, 1994, amending 4 M.R.S.A., § 805A, equally recognizes the central significance of the question of rehabilitation. We quote McKusick, C.J., *In Re: Application of Francis M. Jackson III for Admission to the Bar of Maine*, Maine Supreme Judicial Court, C.A. No. 5411 (November 22, 1977):

> 'However, the true test of admission to the bar is not whether the applicant has been possessed of good moral character throughout his life, but rather whether he is now possessed of good moral character . . . . This view is consistent with the importance our judicial system places on the concept of rehabilitation. The court does not perceive that the public interest, which is the paramount consideration here, would be served by never allowing an applicant to adduce proof of his changed character, for to adopt that rule would be to deny any potentiality for reform of character and to discourage individuals from attempting to rehabilitate themselves. The court rejects the rule that a felony conviction bars one absolutely, i.e., regardless of rehabilitation, from the practice of law. Such is not the law of Maine or most jurisdictions.' "

An abundance of evidence in the form of oral testimony and written statements warranted the board's findings. The following are but a few representative samples:

1) Michael C. Bach, M.D., reported that Prager "worked endlessly to provide optimal care for [Bach's] patients." He testified to arriving at Prager's home to find him busy cleaning up a patient who had been incontinent of stool, "with gloved hands and towels and loving care." Dr. Bach also testified, "I was able to see the hospice as it functioned on a day-to-day basis. . . . What I saw was absolutely outstanding. His care was superlative. . . . I think his moral character is as high and as good as anybody else I've met . . . . I have the greatest regard for his character and I have the greatest regard for his strength of character."

2) Mary H. Loving, R.N., reported that Prager's "kindness, generosity and empathy towards the patients far exceeded what was expected." She testified that Prager had to give medications in the middle of the night, treat a patient's rectal sores, and care for a patient who was regularly incontinent.

3) Elizabeth S. Sterling, R.N., B.S.N., wrote, "I was impressed by his devotion to service and his intense involvement in the care of these patients," and noted that Prager "served as an inspiring leader for all who worked with him . . . as well as performing menial tasks of daily care in his effort to meet these patients' myriad needs — even to their final hours."

4) The brother of a patient praised Prager as "an exceptional caregiver."

5) The parents of another patient wrote they were "continually impressed with his commitment to the patient in his home."

6) William E. Gillis observed, "I was impressed with his willingness to roll his sleeves up and do even the most menial and sometimes not so pleasant chores of nursing care. Mr. Prager showed great empathy and caring. . . . For those who criticized Mr. Prager for not doing more, I can only say that they should try caring for a patient dying with this kind of disease for one week."

7) Sylvia Wesley, R.N., reported that Prager "proved to be an exceptional member of the home care team providing services to people with AIDS. . . . I was impressed by his genuine concern for both the people spending their last days in his home and the care givers like myself who came day after day. . . . It is truly an intense and challenging experience to care for people with end stage AIDS."

8) Roger L. Conover wrote, "I watched him serve with love and sensitivity the physical and emotional needs of dying men and women with whom he shared his rooms and his heart. I cannot say enough about his private devotion to these patients, and the almost Biblical sense of attachment he felt to them, knowing their lives were passing as his was being restored."

9) A law school professor expressed the effect of Prager's experience on Prager as follows: "I have a sense, which of

course I cannot document concretely, that the experience Harvey has gone through, in coming to grips with the reality of his past and the consequences both for him personally and for the promise that had showed itself earlier . . . has made him more valuable, more perceptive, more compassionate, and more committed to fulfilling that promise than he might otherwise ever have been. He speaks sometimes of redemption, and I think that is neither an overstatement nor a cliché for him, but, rather, that it is truly applicable in its best and most catholic meaning, something that perhaps few of us have an opportunity to experience."

10) Michael W. Mullane, the director of the Cumberland Legal Aid Clinic where Prager was employed, testified, "He understands . . . perhaps, more than most of us, the value of the rule of law and its importance. . . . I think Mr. Prager's present moral character is superb and it is not brittle. It is not subject to burnout or lack of attention. I have no reservations."

11) Professor Merle W. Loper, the chairman of the admissions committee at the University of Maine School of Law, testified, "[I]f he hasn't established that he is rehabilitated, then it's hard for me to see how anyone ever could."

At his hearing, Prager characterized his criminal activity as "shameful," — "inexcusable," "a commercial venture," "done for profit," and "large in scale," — and he acknowledged that he "certainly was mature enough and bright enough to have known better." Prager also recognized that there were victims to his criminal activity and he expressed his "unimaginable remorse." He told the board, "I sometimes wish that I could go back in time and relive that shameful period. Of course I cannot. So instead I have gone forward and I have tried to make amends. I know that this will be a life long process. I've accepted that challenge and that burden."

Prager pointed to five stages in his rehabilitation: (1) quitting his personal use of marihuana in 1981; (2) intense introspection during the time of his incarceration and his truthful cooperation with the United States beginning in 1987; (3) his work with people living with and dying of AIDS; (4) his experiences with the legal system, legal education, legal services, and his law clerkship; and most important, (5) his relationship with his wife and daughter. With respect to his work with people living and dying with AIDS, Prager testi-

fied that as they died "they opened their hearts and souls to me and bestowed on me a rare gift. I accompanied [them] on their quest for self-knowledge and redemption. And in so doing, I experienced self-knowledge and redemption myself. I experienced rehabilitation as an inward process and as a state of mind. . . . [They] gave me . . . a new perspective on my life, on my family and on my life's work."

The court concludes, "Although we recognize rehabilitation when an applicant proves his changed character, the applicant has not done so here." *Ante* at 102. I think differently. I agree with the chairman of the admissions committee at the University of Maine School of Law: "[I]f [Prager] hasn't established that he is rehabilitated, then it's hard for me to see how anyone ever could." The court's conclusion appears to rest in substantial part, if not entirely, on its perception that Prager's work experience since his conviction in January, 1988, "includes solely jobs of relatively short duration, *mostly designed to further his own self-interest*" (emphasis added). *Ante* at 97. The court notes that "[n]o other evidence has been presented to show Prager's present involvement in civic activities. Indeed, the seven-year period since his conviction has been spent almost entirely serving his sentence and achieving his law degree." *Ante* at 98. Whether the court's "finding" that Prager's postconviction activities were "mostly designed to further his own self-interest" is warranted, is doubtful. In any event, I do not agree that substantial self-interest is antithetical to true rehabilitation, or that conversion to good moral character is not demonstrated when a man who had been convicted of serious crime turns to a legitimate and socially productive life because of his desire for self-respect, the respect of others, and other material or spiritual rewards. The court states that the "applicant is free to petition for admission to the bar in five or more years hence" (when he will be in his mid-fifties). *Ante* at 100. Is it realistic or fair to expect that then, or at any time, Prager will be able to prove that his "civic activities" or other good works were free from the "taint" of substantial self-interest?

The court "take[s] into account . . . that Prager's work with AIDS patients constituted his alternative sentence, in the design of which he participated." "We are not surprised," the court says, "that Prager would carry out his functions in a diligent manner, with the utmost respect and care for his

patients. This is precisely what was required of him by his sentence." *Ante* at 99. The court, in my view, unfairly minimizes Prager's extraordinary compassion and immensely difficult hands-on service to the dying AIDS patients. Mr. Gillis's observation to the board, set forth above, that, to be able to appreciate that service, a person "should try caring for a patient dying with this kind of disease for one week," is on the mark. Even if Prager's service was no more than what was required of him by his sentence, Prager surely demonstrated his good moral character by fulfilling a most unique and extraordinarily demanding sentence to the complete satisfaction of those who might be expected to be tough task masters; the chief probation officer, the prosecuting assistant United States Attorney, and the trial judge.

"[R]epentance is a relevant factor in determining the rehabilitation of a petitioner." *Matter of Allen*, 400 Mass. 417, 425 n.11 (1987). It is apparent that, having heard his testimony and observed him, in addition to having heard and observed the other witnesses, the board believes that Prager is genuinely repentant, that he has turned his life around and that he is of good moral character. The court should accept the board's findings in that regard. Yes, as the court observes, *ante* at 92, the ultimate question is whether Prager has proved that he "has become 'a person proper to be held out by the court to the public as trustworthy.' " *Matter of Hiss*, 368 Mass. 447, 460-461 (1975), quoting *Matter of Keenan*, 313 Mass. 186, 219 (1943). In my view, by proving his legal skills, which are unquestioned, and his present good moral character, he has demonstrated that he is a person proper to be held out by the court to the public as trustworthy.

The court rightfully does not wish to send the wrong message to the bar or to the public. The court is very properly concerned about the public perception of the integrity of the bar and public confidence in the administration of justice. I respectfully suggest, however, that this court's order denying Prager's application to the bar of this Commonwealth delivers the wrong message. " 'A fundamental precept of our system . . . is that men can be rehabilitated. "Rehabilitation . . . is a 'state of mind' and the law looks with favor upon rewarding with the opportunity to serve, one who has achieved 'reformation and regeneration.' " ' *March* v. *Committee of Bar Examiners*, 67 Cal. 2d 718, 732 (1967)."

*Matter of Allen, supra* at 425. *Matter of Hiss, supra* at 454. Recognizing that principle, the board stated, "The concept that human redemption is possible and valuable is both well established in law and premised upon long-standing, even ancient traditions. The public interest would be ill-served if we refused to recognize rehabilitation when it is adequately proved. Avoidance by us of making a judgment concerning rehabilitation would itself be an act which would tarnish the image of the Bar." This case presents an appropriate opportunity for the court to deliver to the bar and the public the encouraging and humane message that the court will recognize and support a wrongdoer's rehabilitation when it has been fairly proved as it was here. The court fails to do so and therefore conveys the opposite, discouraging, message. I respectfully dissent from the court's order.