**In re John C. DORTCH, Applicant,**

**An Applicant for Admission to the Bar of the District of Columbia Court of Appeals.**

No. 01–BG–1385.

District of Columbia Court of Appeals.

Argued April 8, 2003.
Decided Oct. 21, 2004.

Daniel A. Katz, Washington, DC, for the applicant.

Alan H. Kent, Washington, DC, for the Committee on Admissions.

Before SCHWELB,* GLICKMAN and WASHINGTON,** Associate Judges.

GLICKMAN, Associate Judge:

John C. Dortch has applied for admission to the Bar of this Court. Dortch's application is unusual, and problematic, because of his criminal record: he was convicted in 1975 of second-degree murder, attempted armed robbery, and conspiracy. In view of these convictions, for which Dortch served fifteen years in prison and is now on parole, the Committee on Admissions commenced an investigation and held a formal hearing on Dortch's application pursuant to D.C.App. R. 46(f). The Committee concluded that Dortch has not met his burden of demonstrating, by clear and convincing evidence, that he possesses "good moral character and general fitness to practice law." D.C.App. R. 46(e). The Committee recommends that Dortch's application be denied.

■ In acting on Dortch's application, we accept the Committee's factual findings insofar as they are supported by substantial evidence of record. Although "we afford the Committee's recommendations some deference, ... the ultimate decision regarding admission or denial of admission remains for this court to make." *In re Manville,* 494 A.2d 1289, 1293 (D.C.1985) ("*Manville I*").

This court has "eschewed a *per se* rule of exclusion for previously convicted felons, opting instead for case-by-case determinations of whether the applicant, as of the time of application, has the good moral character necessary for admission to the bar." *In re Manville,* 538 A.2d 1128, 1132 (D.C.1988) (en banc) ("*Manville II*"). Despite "the presumption of bad character" arising from a felony conviction, we have chosen to proceed on the premise that "a few persons who have been convicted of felonies may become sufficiently rehabilitated to meet the demanding ethical requirements of the legal profession...." *Id.* at 1134, 1137. In this case we are prepared to acknowledge that Dortch has presented credible evidence of rehabilitation.

Dortch's showing is not sufficient to cause us to grant his application, however. Considering the record in its entirety, we cannot find with the high degree of certainty required by the standard of clear and convincing evidence that Dortch has reformed himself to the point that he now possesses the good moral character required for admission to the Bar. Nor, even apart from the character inquiry, can we find that Dortch has proven his general fitness to practice law, for it would be erosive of public confidence in the legal profession and the administration of justice were we to admit an applicant who is still on parole for crimes as serious as those committed by Dortch. For both of

---

* Judge Schwelb concurs in the result and in all of Judge Glickman's opinion for the court except Part II.C. Judge Schwelb would not reach the issue addressed in Part II.C and expresses no opinion as to the merits of that issue.

** Judge Washington concurs in the result and in all of Judge Glickman's opinion for the court except Part II.B.

these reasons, we deny Dortch's application for admission to the Bar of this Court.

## I. FACTS

### A. Dortch's Criminal Conviction

In 1974, the applicant who is now before us was twenty-nine years old, a college graduate and Vietnam veteran who had achieved considerable success and recognition in the business world as a field underwriter for a large insurance company. John Dortch's life changed course when he quit his job at the insurance company to start his own business, J.C.D. Enterprises. Dortch solicited investors in J.C.D. Enterprises from among his former insurance clientele. The business foundered. Unable to obtain the needed infusion of cash to avoid bankruptcy, Dortch came up with a desperate scheme to rob a savings and loan institution. Dortch claims, and the Committee on Admissions found, that he was "a legitimate businessman who hatched a bizarre plot to repay his investors with the proceeds of a bank robbery." [1]

To carry out this plot, Dortch enlisted at least six confederates from among his business or social acquaintances, one of whom was a young woman who worked inside the targeted financial institution. Dortch planned the robbery meticulously. On September 20, 1974, the agreed-upon date, Dortch and co-conspirator John Bryant drove to the vicinity of the savings and loan. Disguised as construction workers, the pair carried a bricklayer's tool bag containing sawed-off shotguns and other firearms that Dortch had supplied. One of the shotguns had been a Christmas present from Dortch's wife; he had sawed off the barrel himself.

Unbeknownst to Dortch and Bryant, the police had been tipped off and were waiting for them. Two plainclothes officers stopped them on the street when they exited their car before they reached the savings and loan. The officers directed Dortch to bring the tool bag to a police cruiser parked nearby. Dortch removed one of the sawed-off shotguns and approached the police cruiser with it. An officer reached for Dortch's weapon and it accidentally discharged. No one was injured (except that Dortch himself received a minor powder burn), but Dortch and Bryant immediately fled in opposite directions. One of the officers fired shots at the fleeing suspects. According to the officers' testimony at the subsequent trial, Dortch turned and fired back.

Dortch discarded his construction-worker garb and escaped without further incident. Later that day, however, Dortch learned that his accomplice Bryant had shot and killed 24-year-old Metropolitan Police Officer Gail Cobb, who had confronted Bryant in a parking garage as he was removing his disguise. "Cobb was alone with her revolver in her holster when Bryant, who had been standing with his hands against a wall, turned and shot Cobb in the heart." *In re Dortch,* 344 Md. 376, 687 A.2d 245, 246 (Md.1997).

Dortch turned himself in to the police the following morning. He was indicted

---

1. We summarize the facts as the Committee found them, which is basically the version of events that Dortch has provided. However, there are indications in the (incomplete) record before us that Dortch was engaged in something even more sinister. For example, the Assistant United States Attorney who allocuted at Dortch's sentencing asserted that Dortch had planned other "organized criminal activities" to follow the bank robbery. Similarly, the record raises questions about the legitimacy of J.C.D. Enterprises. But given the view we take of Dortch's application, we find it unnecessary to examine these questions further.

along with six co-defendants on multiple charges, including first-degree felony murder. The case went to trial in June of 1975. During the presentation of the prosecution's case-in-chief, Dortch decided to accept a plea offer. He pleaded guilty to second-degree murder, attempted armed robbery and conspiracy. On July 30, 1975, the court imposed concurrent sentences of fifteen years to life in prison on the first two charges and five years in prison on the conspiracy charge. The court rejected Dortch's request for probation.

Dortch filed two motions to reduce his sentence, both of which were denied. Thereafter, between 1977 and 1984, Dortch filed three successive, unsuccessful motions to withdraw his guilty plea or set aside his sentence. Among other things, Dortch alleged that he was coerced and misled into tendering an involuntary and incompetent guilty plea; that police officers perjured themselves at his trial when they testified that he fired at them as he fled; that his trial counsel was ineffective and had a "tacit understanding" to assist the prosecution in securing his conviction; and that his sentence was based on misrepresentations and incomplete information. Dortch described himself in his post-conviction filings as the victim of a shadowy criminal network whose members forced him against his will to carry out a bank robbery for their own nefarious purposes. Moreover, Dortch maintained that he had decided not to proceed with the robbery and was returning the bag of firearms to his car when the police stopped him. But for the fact that the police officers "overreacted," Dortch argued, "Officer Cobb would be alive today."

### B. Dortch's Rehabilitation

Dortch was incarcerated in federal prison facilities from 1975 to 1990. "By all accounts," as the Committee on Admissions states in its report, "Dortch was a model prisoner during his 15 years of incarceration." He received training in accounting and earned money working in the UNICOR Federal Prison Industries program. The Committee found that Dortch also participated in educational and church-related activities, tutored and assisted other inmates, and directed a prison chapter of the NAACP. Prison officials commended him for his excellent institutional adjustment.

Dortch was paroled by the United States Parole Commission at his first eligibility date, and he returned to Washington, D.C., in the spring of 1990. The Committee on Admissions found no evidence that Dortch ever violated any conditions of his parole or caused his parole supervisors concern over his adjustment to the community. The Parole Commission released Dortch from further supervision in June 1999, though he remains on parole and is subject to the resumption of supervision or even revocation if he is found not to be living "a law-abiding and reputable life." Dortch applied for a Presidential pardon in 1997, but his application has not been acted upon.

After he returned to Washington in 1990, Dortch was hired by the Covenant Baptist Church to work as a business manager. Dortch took the opportunity to become active in the Church. He taught adult Sunday School classes and served on the board of directors of an early childhood education program. The pastor of the Church told the Admissions Committee that Dortch was "open and honest" about his criminal past and was a "very competent, efficient worker." Dortch remained an employee of the Church until 1992.

Meanwhile, in August 1990, only a few months after his release from prison, Dortch applied for admission to the Dis-

trict of Columbia Law School. He disclosed his criminal record on his application in response to a question that asked him to describe "a specific personal experience" in which he was "subjected to or witnessed some significant form of injustice." Dortch answered this question by depicting his own prosecution as an "injustice"—indeed, as an "abortion of justice"—that he had "suffered":

> I am an ex-offender, and I have witnessed and experienced improprieties in the administration of justice. By virtue of a guilty plea, I was convicted of second degree murder, attempted bank robbery, and conspiracy, and I served fifteen years in prison. I did not kill anyone nor did I attempt to kill anyone nor was I present at the scene of the homicide, but the alleged factual basis for my plea was predicated upon the felony murder concept, which stipulates that each conspirator is equally accountable for every and anything that transpires in the furtherance of a felony, even though he may not participate in the overt act. The injustice that I suffered was at the hands of both the defense counsel, whom I paid in advance, and the prosecution which condoned, if not encouraged, the perjurious testimonies of the complaining officers.

> However, I am not bitter, because I did break the law, but not to the extent to which I was charged and prosecuted. The bottom line is that I did break the law, and had not I broken the law, I would not have been vulnerable to an abortion of justice.

The District of Columbia Law School accepted Dortch as a student. He performed well in law school and was well respected. Of particular note, Dortch was awarded the Dean's Cup for outstanding community service, he was elected president of the Student Bar Association, and he was selected by his classmates to deliver the 1994 law school commencement address. Since his graduation, Dortch has served as an adjunct professor at the law school. From 1996 to 1997, Dortch resided in Charleston, West Virginia, where he worked as a paralegal in a law firm. In 1997 Dortch returned to the Washington area to work as a paralegal for a Maryland firm.

Beginning in the fall of 1998, Dortch began working with the Time Dollar Youth Court, a diversion program for first-time juvenile offenders. Dortch eventually became the director of the program. He also has engaged in other public service activities. At the request of the National Black Police Association, Dortch traveled to Toronto, Canada, in September 2000, to participate in the International Symposium on People of Color in the Criminal Justice System. In January 2001, Dortch was appointed Director of the Violence Free Zone Initiative of the National Center for Neighborhood Enterprise at an annual salary of $80,000.

Although Dortch has been a law-abiding citizen and lived a constructive life since his release from prison in 1990, he has made no apologies or restitution to the family of Officer Gail Cobb.[2] Dortch told the Committee on Admissions that he had conferred with the National Victim's Center and an expert on "restorative justice" and victim/offender mediation in an effort to bring about a reconciliation with the

---

**2.** Dortch does not contest the Admissions Committee's finding that he had financial resources available with which to offer monetary assistance. Even while Dortch was incarcerated, he had earnings from which he was admittedly able "to build a 'nest egg,' send money home regularly, and buy some property 'in the Ozarks' which he sold for $16,000.00 in 1998."

Cobb family. Nothing came of those efforts.[3]

## C. Dortch's Bar Applications

In 1995 and 1996, Dortch passed bar examinations in the District of Columbia, Maryland, and West Virginia, and he applied for admission to the bar in all three jurisdictions. In so doing, Dortch fully disclosed his criminal convictions and the circumstances that gave rise to them. While Dortch took pains to emphasize on his application in the District of Columbia "that I neither killed anyone nor was I at the scene where the homicide took place," he readily acknowledged that he had "orchestrated a conspiracy to commit an armed robbery":

> My deep sense of obligation to my investors severely clouded my judgment. Obviously, I made the wrong decision, one which I shall regret for the rest of my life. I orchestrated a conspiracy to commit an armed robbery. Of course I now realize that regardless of motive, there is no right reason for doing the wrong thing. Morality is absolute and immutable and must not be compromised.

Dortch added that he hoped to atone through public service:

> My decision to violate the law was totally out of character for me, and I shall not attempt to rationalize such a

tragic error in judgment. I made a very serious mistake, and although the past is irrevocable, I am now committed to a lifetime of public service.

Dortch also expressed his contrition in his live testimony before the Admissions Committee, which concluded that he "appeared sincere in expressing remorse and in accepting responsibility for his criminal actions."

Dortch marshaled an impressive array of strong character references in support of his application. The witnesses attesting to Dortch's rehabilitation and his fitness to practice law included his law school dean, several law professors, the law school's director of admissions, a former chair of the District of Columbia Board of Parole, a former parole examiner, a probation officer, a retired police captain, an assistant general counsel with the Metropolitan Police Department, the Executive Director of the National Black Police Association, the pastor of his church, a church deacon, and an Associate Director of the Council of Churches of Greater Washington.[4]

The Admissions Committee held Dortch's application in abeyance pending the outcome of the Maryland and West Virginia proceedings. On January 6, 1997, the Court of Appeals of Maryland rejected Dortch's application as "premature" because he had not yet been released from parole. *In re Dortch*, 687 A.2d at 251.

---

**3.** There also is no indication that Dortch has done anything to assist any of the persons he solicited to participate in his conspiracy, all of whom ended up with felony convictions as a result. We note that when Dortch spoke at his sentencing in 1975, he acknowledged his responsibility for his co-defendants' involvement:

> During my incarceration I have had much time for much prayer and meditation, Your Honor, and I am pleased with my God. But in order for me to realize a perfect peace I must walk in fellowship with my brothers. As a matter of conscience,

> Your Honor, I must accept responsibility not only for my involvement in this incident but also for the involvement of my co-defendants because I got them involved. I solicited their participation and perpetration of this crime.

**4.** The Admissions Committee received letters in opposition to Dortch's application from representatives of the Fraternal Order of Police, the Executive Director of Concerns of Police Survivors, Inc., and the family of Metropolitan Police Officer Gail Cobb.

Observing that "[a] person on parole is still serving a prison sentence, albeit, beyond the prison walls," Maryland's highest court held that it "will not even entertain an application to admit a person to the practice of law when that person is still directly or indirectly serving a prison sentence for a crime so severe that disbarment would be clearly necessitated if the crime were committed by an attorney." *Id.*

A few months later, on April 14, 1997, the Supreme Court of Appeals of West Virginia denied Dortch's application on its merits. *In re Dortch,* 199 W.Va. 571, 486 S.E.2d 311 (1997). The court "acknowledge[d] Mr. Dortch's commendable prison record, his present dedication to community service and his extensive rehabilitative efforts during the seven years since his release from prison," as well as Dortch's "candor in admitting his guilt and responsibility in the death of Officer Cobb." *Id.* at 321. Nonetheless, the court concluded, "[t]hough Mr. Dortch may have demonstrated that he has been rehabilitated, … the horrendous crime of which he was the prime conspirator outweighs his present good deeds." *Id.* On that basis, the highest court of West Virginia stated, "[w]e firmly believe that it would be detrimental to the public interest and the public's confidence in the integrity of the legal profession were we to admit Mr. Dortch to the practice of law in this state." *Id.* (footnotes omitted).

Following the decisions in Maryland and West Virginia, the Committee on Admissions in the District of Columbia took up Dortch's application. At the conclusion of three days of hearings in 1998, the Committee invited Dortch to submit a supplemental memorandum addressing the pertinence of the decisions of the Maryland and West Virginia courts. Dortch submitted a memorandum in which he argued that those decisions should not be followed because they adopted *per se* rules of exclusion that were inconsistent with the law of the District of Columbia.

The Committee on Admissions issued its Report and Recommendation on October 15, 2001. Guided by our decisions holding that prior criminal convictions do not necessarily disqualify a bar applicant who has been rehabilitated, the Committee undertook to assess whether Dortch had established his good moral character and general fitness to practice law by clear and convincing evidence.

Ultimately, the Admissions Committee was unanimous in concluding that Dortch had not met his burden of proof and in recommending that his application be denied. The seven-member Committee was divided, however, over the rationale for its conclusion and recommendation. Its division mirrored the different rationales espoused by the high courts of Maryland and West Virginia in their decisions denying admission to Dortch.

A four member majority of the Committee joined in a statement of reasons drafted by Vice Chair Mark S. Carlin. These members in the majority found it difficult to distinguish Dortch's case from that of Daniel Manville, whose application for admission this Court granted despite his prior conviction for a comparably heinous homicide. *See Manville II,* 538 A.2d at 1130. Dortch's showing that he had rehabilitated himself was no less "impressive," the majority found, than Manville's showing. Nonetheless, despite the similarity of the two cases, the Admissions Committee majority recommended that Dortch's application be denied on the basis of one key difference—the fact that Dortch, unlike Manville, is still on parole. In agreement with the holding of the Maryland Court of Appeals, the majority concluded that "it would grievously undermine public confidence in our profession" to admit an appli-

cant who is on parole for such a crime as murder. As the majority explained:

> [W]e are obligated to consider our two principal goals: "the protection of prospective clients and the assurance of the ethical, orderly, and efficient administration of justice." *Manville I*, 494 A.2d at 1298. We cannot fathom that we assure the public "of the ethical, orderly, and efficient administration of justice" by recommending admission of a convicted murderer on parole. In fact, we think that Dortch's admission while on parole could lead to public disrespect, opprobrium, and even ridicule of the Bar admissions process.

Three members of the Admissions Committee embraced a different rationale for denying Dortch's application. In a statement of reasons authored by the Committee's Counsel, Alan H. Kent, these three concurring members acknowledged that Dortch presented "substantial evidence of rehabilitation" and even that he compared favorably to Manville in "many" respects. They pointed out, however, that Dortch has a higher burden of proof than Manville had: under former Rule 46, Manville needed only to prove that he was rehabilitated by a "preponderance of the evidence," *see Manville II*, 538 A.2d at 1134 & 1134 n. 7, while under current Rule 46, Dortch must prove that he has the requisite character and fitness by "clear and convincing evidence." D.C.App. R. 46(e). The concurrence also deemed apposite this Court's recognition that even under a preponderance standard, "in the case of extremely damning misconduct, a showing of rehabili-

tation may be virtually impossible to make." 538 A.2d at 1134 n. 7 (internal quotation marks and citations omitted). The concurring members of the Admissions Committee concluded that Dortch's particular misconduct was so "extremely damning" that all the mitigating factors in his favor did not suffice to outweigh it.[5] That Dortch also is still on lifetime parole for his offenses only solidified the conclusion reached by these members that Dortch is unable to prove his good moral character and fitness to practice law by clear and convincing evidence at the present time.

Upon receiving the Report and Recommendation of the Committee on Admissions, we issued an order directing Dortch to show cause why his application for admission to the Bar of this Court should not be rejected.

## II. DISCUSSION

■ Dortch asks us to examine the record in its entirety and recognize that his "one involvement in criminal activity occurred [thirty] years ago, that he accepted responsibility for his crime, that he has demonstrated remorse, that he served a lengthy prison sentence, that he successfully endeavored to reform himself and was a model prisoner, [and] that his academic and professional accomplishments— as well as the opinions of those who have known him professionally and personally since his release from prison—[demonstrate] by clear and convincing evidence [that] he possesses the moral character and fitness to be admitted to the bar." In

---

**5.** In evaluating Dortch's misconduct, the concurring members "rel[ied] principally upon the nature of [Dortch's] homicide conviction, i.e., murder in the second degree during the course of an armed robbery planned by the applicant and in which the applicant also supplied the guns." ("By comparison," the concurrence noted, "Manville had been con-

victed of the lesser crime of voluntary manslaughter.") Although the victim's status as a police officer increased "the enormity of the offense for bar admission purposes," the concurring members considered Dortch's participation in a murder to be " 'extremely damning misconduct' *regardless* of the status of the victim."

view of his reformation, Dortch contends, his status as a parolee should not be disqualifying.

While we commend Dortch on his rehabilitation, achievements and commitment to public service, we are unable to arrive at the conclusion that Dortch desires us to reach. When we consider Dortch's application in light of all relevant factors, we are not satisfied that Dortch has established his full moral regeneration by clear and convincing evidence. Moreover, since Dortch is still on parole for murder and attempted armed robbery, we conclude that his application for admission to the bar is premature; to admit an individual still serving such a sentence would jeopardize public respect for the law and confidence in the legal system.

## A. The Governing Legal Framework

■■■ "The license to practice law in the District of Columbia is a continuing proclamation by this Court that the holder is fit to be entrusted with professional and judicial matters, and to aid in the administration of justice as an attorney and officer of the court." D.C. Bar Rule XI, § 2(a). Accordingly, all applicants for admission to our Bar have the burden of demonstrating, by clear and convincing evidence, that they possess "good moral character and general fitness to practice law" in the District of Columbia. D.C.App. R. 46(d), (e). We impose such a burden for "the protection of prospective clients, and the assurance of the ethical, orderly, and efficient administration of justice." *Manville I,* 494 A.2d at 1298. As the foregoing statements imply, the "character and fitness" test is "two pronged. Not only must [an applicant] demonstrate the requisite moral qualifications and learning in the law, but he [or

she] also must show that [his or her admission to] the practice of law will not be detrimental to the integrity of the bar, the administration of justice, or the public interest." *In re Prager,* 422 Mass. 86, 661 N.E.2d 84, 90 (1996).

■■■ We have said that in the bar admission context, the term "good moral character" refers to traits such as fairness, honesty, truthfulness, discretion, trustworthiness, reliability, respect for the rights of others and the law, and reasonableness—traits that bespeak the applicant's willingness and ability to act in accordance with the Rules of Professional Conduct and other applicable ethical and legal strictures. *Manville I,* 494 A.2d at 1298; *see also Konigsberg v. State Bar of California,* 353 U.S. 252, 264, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957); *In re Matthews,* 94 N.J. 59, 462 A.2d 165, 173 (1983).[6] The term "fitness" requires consideration of additional factors. An applicant may be of sterling moral character but be unable to assume the duties of a lawyer on account of other deficiencies—lack of legal proficiency or ill health, for example. In addition, "it is appropriate ... to consider the public perception of and confidence in the bar when determining the fitness of original applicants to practice law...." *Prager,* 661 N.E.2d at 90. This latter consideration has long been recognized explicitly in D.C. Bar R. XI, § 16(d)(2), which provides that an attorney who has been disbarred on account of misconduct and who seeks to be reinstated must prove, in addition to his or her moral qualifications and competence, "[t]hat the resumption of the practice of law by the attorney will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest." There is no

---

6. For a critique of the universally followed inquiry into the moral character of applicants to the bar, *see* Deborah L. Rhode, *Moral Character as a Professional Credential,* 94 YALE L.J. 491 (1985).

reason why applicants for original admission should be held to a lesser standard.

A conviction for a crime involving moral turpitude—such as the crimes committed by the applicant now before us [7]—is "conclusive evidence of lack of good moral character [and, we would add, fitness] at the time of the offense." *Prager*, 661 N.E.2d at 89. This is tautologically so. Indeed, when a member of our Bar is convicted of such a crime, disbarment is automatic and unavoidable. D.C.Code § 11–2503(a) (2001).

Our inquiry in this case does not end there, however. In line with most, if not all, jurisdictions, this court held in *Manville I* and *Manville II* that a prior criminal conviction does not necessarily require exclusion of an applicant from the Bar for all time. *Cf. In re McBride*, 602 A.2d 626, 641 (D.C.1992) (en banc) (holding that an attorney disbarred upon conviction of a crime of moral turpitude may petition for reinstatement after five years). Such a *per se* rule of exclusion would collide with the principle that "good character [and fitness] *at the time of application* is the appropriate test." *Manville II*, 538 A.2d at 1132 (citing *Schware v. Board of Bar Examiners*, 353 U.S. 232, 246, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957)) (emphasis added). Animating our rejection of a *per se* rule even when the applicant's past offenses are grave ones is "[t]he concept that human redemption is possible and valuable"—a belief that "is both well established in law and premised upon long-standing, even ancient traditions." *Prager*, 661 N.E.2d at 89 (internal quotation marks omitted). Thus, "rather than taking the view that prior serious misconduct invariably requires disqualification, [we] consider the facts of each case in light of the totality of circumstances surrounding

an application for bar admission." *Manville I*, 494 A.2d at 1295. Without minimizing or discounting the adverse inferences to be drawn from an applicant's criminal record, we also take evidence of "reform and rehabilitation" into account. *Id.*

To guide the "totality of circumstances" inquiry, our opinions in *Manville I* and *II* identified the following factors that other courts have deemed relevant to consider in evaluating the moral fitness of applicants with criminal backgrounds:

1. The nature and character of the offenses committed.

2. The number and duration of offenses.

3. The age and maturity of the applicant when the offenses were committed.

4. The social and historical context in which the offenses were committed.

5. The sufficiency of the punishment undergone and restitution made in connection with the offenses.

6. The grant or denial of a pardon for offenses committed.

7. The number of years that have elapsed since the last offense was committed, and the presence or absence of misconduct during that period.

8. The applicant's current attitude about the prior offenses (e.g., acceptance of responsibility for and renunciation of past wrongdoing, and remorse).

9. The applicant's candor, sincerity and full disclosure in the filings and proceedings on character and fitness.

10. The applicant's constructive activities and accomplishments subsequent to the criminal convictions.

11. The opinions of character witnesses about the applicant's moral fitness.

---

7. *See, e.g., In re Tidwell*, 831 A.2d 953, 957 (D.C.2003).

*Manville II,* 538 A.2d at 1133 n. 4. In our *Manville* decisions and in subsequent cases we have consistently evaluated bar applicants with criminal records by reference to these factors. We have done so, however, on the understanding that the list is "illustrative rather than exhaustive.... These factors can, at best, serve as mere indicia of an applicant's good moral character." *Manville I,* 494 A.2d at 1297.

All of this is emphatically *not* to say that overcoming past criminal convictions, even of "offenses less heinous than manslaughter, armed robbery, or illegal drug transactions," is easy. *In re Demos,* 579 A.2d 668, 672 (D.C.1990) (en banc). Felony misconduct is highly probative of a person's character, and overcoming such evidence of one's character—even with the passage of years—is a difficult task. Thus, we took pains in our *Manville* decisions to emphasize that even though, at that time, Rule 46 "describe[d] the applicant's burden in terms of 'preponderance of the evidence' rather than 'clear and convincing' or 'beyond a reasonable doubt,' an applicant with a background of a conviction of a felony or other serious crime must carry a very heavy burden in order to establish good moral character." *Manville II,* 538 A.2d at 1134 n. 7. Such an applicant, we stated, must "prov[e] his full and complete rehabilitation subsequent to the conviction." *Id.* (internal quotation marks and citations omitted). Without reservation, we agreed with the Supreme Court of New Jersey that "[t]he more serious the misconduct, the greater the showing of rehabilitation that will be re-

quired.... [and] in the case of extremely damning past misconduct, a showing of rehabilitation may be virtually impossible to make." *Id.* (quoting *Matthews,* 462 A.2d at 176).

Furthermore, on the issue of general fitness apart from moral character, the more serious the misconduct, the heavier will be the applicant's burden to dispel the concern that his or her admission to practice law—to assume the responsibilities and privileges of an officer of the court—will be detrimental to the integrity and standing of the Bar.[8] As is true when we consider petitions for reinstatement filed by attorneys who have been disbarred for crimes of moral turpitude, we must be assured, for example, that the public will not perceive an applicant's admission to the bar "as an indication that the original offense was not viewed with sufficient gravity." *In re Borders,* 665 A.2d 1381, 1382 (D.C.1995) (internal quotation marks and citation omitted). *See also id.,* 665 A.2d at 1388 (King, J., concurring) ("[I]n some cases the criminal conduct is so offensive, so contrary to the norms of society, and so destructive of the system of justice, that a conviction should result in disbarment, if not for life, then for such a significant period of time that there is no danger that reinstatement would result in diminished respect for members of the bar, the legal profession, and the system of justice by the public at large.").

■■■■■ If the burden of proof was daunting in 1988, when *Manville II* was decided, it became even more so the following year. In 1989 this Court amended

---

8. The appearance of impropriety or corruption can diminish the stature of the legal profession, and cause a loss of confidence in the ability of lawyers to protect and preserve our legal institutions. This, in turn, can diminish respect for and compliance with the law. For these reasons, states are especially careful in establishing guidelines

for determining the admissibility of an applicant with a record of prior criminal conduct.

Maureen M. Carr, Note, *The Effect of Prior Criminal Conduct on the Admission to Practice Law: The Move to More Flexible Admission Standards,* 8 GEO. J. LEGAL ETHICS 367, 379 (1995).

Rule 46 to require applicants to our Bar to prove their character and fitness by clear and convincing evidence.[9] *See Demos*, 579 A.2d at 673 n. 8. This was no mere cosmetic change. *See id.* at 674–75 (Farrell, J., concurring). A "preponderance of the evidence" standard simply requires the fact finder to believe that the existence of the contested fact is more "plausible" than its nonexistence; in contrast, the "standard of clear and convincing proof requires evidence that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re T.J.*, 666 A.2d 1, 16 n. 17 (D.C.1995) (internal quotation marks and citations omitted). While the "preponderance" standard "allows both parties to share the risk of error in roughly equal fashion," the more stringent "clear and convincing" standard "expresses a preference for one side's interests" by allocating more of the risk of error to the party who bears the burden of proof. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (internal quotation marks and citations omitted). Thus, under Rule 46, the public interests in the protection of the community and the integrity of the administration of justice are "preferred," as it were, over the applicant's private interest in obtaining a law license. As a reflection of that preference, the applicant bears the risk of error more heavily than before on the issues of character and fitness. Now, in the words of the New Jersey Supreme Court, the "applicant's attitude and behavior subsequent to disqualifying misconduct must demonstrate a reformation of character so convincingly that it is proper to allow admission to a profession whose members must stand free from all suspicion." *Matthews*, 462 A.2d at 176.

## B. The Question of "Good Moral Character"

This Court admitted Daniel Manville to its Bar despite his criminal past and his conviction, fifteen years earlier, of a homicide that he committed in the course of a burglary. *See Manville II*, 538 A.2d at 1129–30.[10] Both Dortch's crimes and the evidence of his rehabilitation are comparable to Manville's; to the extent there are factual differences, we do not find them to be material. But the standard of proof by which we measure Dortch's claim of good moral character is stricter, and it compels us, we think, to reach a different decision. Evaluating Dortch's application in light of the so-called *Manville* factors, but holding that application to a clear and convincing evidence standard of proof, we are not persuaded of Dortch's present good moral character to the degree of certitude required for admission to the Bar.

We are obliged to begin our evaluation with what we think should be obvious.

---

**9.** This change conformed the standard of proof in District of Columbia with the standard used in other jurisdictions where the applicant has been convicted of a felony. *See Prager*, 661 N.E.2d at 90.

**10.** In our en banc opinion, we described Manville's offense as follows:

> Manville and his younger brother agreed to assist another student in recovering drugs and money believed to have been stolen by one Doug Edgar. Manville, his brother, and another person entered Edgar's apartment under the pretext of purchasing drugs, then threatened him with a gun and a knife. When two visitors arrived unexpectedly, Manville used chloroform to render Edgar and the visitors unconscious. One of the visitors died from an unusual reaction to the chloroform. Charged with murder, Manville entered a plea of guilty to manslaughter and received a sentence of from fifty-four months to fifteen years in prison. The sentencing judge later opined that he doubted that Manville had intended to kill anyone.

> *Id.* at 1130.

This case is not about the forgivable foibles of an applicant's callow youth. Dortch masterminded and attempted to carry out a conspiracy to commit armed bank robbery. With pecuniary motives, Dortch conceived of the crime, planned it with care, enlisted accomplices, furnished the deadly weapons, and personally led the actual attempt. It misses the point for Dortch to emphasize that the murder of Officer Cobb was not part of his plan, that he was not the direct cause of the fatal shooting, and that he was not even on the scene when it happened. It is more to the point that Dortch knowingly, deliberately, and willingly put innocent lives at risk. Officer Cobb's shooting was a foreseeable consequence, and—as Dortch now concedes—he cannot escape the legal or moral blame. In terms of what they say about Dortch's moral character, the several crimes he committed were indeed "extremely damning."

In our view there were no mitigating circumstances. This was not a crime of passion or of desperation. We are not impressed with Dortch's explanation (assuming it is true) that he could not bear to see his investors lose their investments in his business. That Dortch's venture into criminality may have been "aberrational" counts for nothing; perhaps, as the government contended at Dortch's sentencing, the venture would not have been so aberrational had it succeeded. In any event, Dortch's "conduct was the product of neither inexperience nor immaturity." *Prager*, 661 N.E.2d at 92. The opposite is the case: Dortch was twenty-nine years old, married, a father, a college graduate, a Vietnam veteran, and an experienced and accomplished businessman. Dortch's moral character was not still in formation, and he was "not without adequate resources to choose from a variety of paths of conduct" other than the fatal path he selected. *Id.*

Plainly, the first four *Manville* factors—the nature and character of the offenses committed, the number and duration of offenses, the age and maturity of the applicant when the offenses were committed, the social and historical context—weigh heavily against Dortch. We need not belabor the point.

The fifth *Manville* factor directs us to consider both the sufficiency of Dortch's punishment and his efforts to make restitution for his wrongdoing. As to the former, Dortch was paroled after serving fifteen years in prison. We will not quibble with the opinion of the Admissions Committee that Dortch's sentence adequately reflected the severity of his offense and that he did not receive "inappropriate consideration of mitigating factors: he was a first offender, he surrendered to the authorities within 24 hours of learning of the death of Officer Cobb, and he was not the shooter." Of greater importance to our thinking is the fact that in all the years since his conviction, Dortch has done nothing tangible to help, nor has he offered to help, those still living whom he permanently and deeply harmed by his criminal enterprise: Officer Cobb's family, his confederates, and their families. We appreciate that extending such help might have entailed special effort and even personal sacrifice on Dortch's part. That is one of the reasons why it would have been a meaningful thing to do. It is easy to express remorse, but substantiation of that remorse through acts of restitution seems appropriate in a situation such as this one. Dortch's failure to make restitution undermines his claim of moral regeneration.

■ Turning to the sixth and seventh factors, thirty years have elapsed since Dortch committed his offenses in 1974. Dortch's application in the interim for a Presidential pardon has not been granted. "Passage of time alone is insufficient to

warrant admission." *Prager,* 661 N.E.2d at 92–93 (internal quotation marks, brackets, and citations omitted). Still, "[b]y all accounts," as the Admissions Committee determined, "there have been no episodes of misconduct, either in federal prison or in the community, since the failed armed robbery and murder." Dortch's law-abiding behavior over this extended duration is some evidence of his rehabilitation, but its probative value is limited. Like the Supreme Court of Minnesota, "we are not persuaded that evidence of conduct while a petitioner is incarcerated is demonstrative of moral fitness or rehabilitation. The constant scrutiny to which the conduct of a prisoner is subjected is intended to minimize his opportunity to exercise discretion or engage in conduct beyond that delimited by prison officials." *In re Thompson,* 365 N.W.2d 262, 264 (Minn.1985). Good behavior while on parole—at least while actively supervised-arguably should be discounted for similar reasons, though surely not to the same degree. More fundamentally, "service of the sentence imposed, and not committing further crimes, standing alone, do not prove rehabilitation. Merely showing that an individual is now living as and doing those things he or she should have done throughout life, although necessary to prove rehabilitation, does not prove that the individual has undertaken a useful and constructive place in society." *In re Cason,* 249 Ga. 806, 294 S.E.2d 520, 522–23 (1982).

The eighth and ninth *Manville* factors direct us to consider an applicant's "current attitude" about his offenses—i.e., his or her acceptance of responsibility, renunciation of past wrongdoing, and remorse— and the applicant's "candor, sincerity and full disclosure" in the admission proceedings. The Admissions Committee heard directly from Dortch, questioned him closely, and ultimately credited his current statements of responsibility and remorse.[11] The Committee also found that Dortch was candid in his application and in the proceedings to examine his character and fitness, noting that he "readily admitted ... to having 'orchestrated a conspiracy to commit an armed robbery.'" While we accept the Committee's factual findings on these points, we are constrained to say that in reviewing the record, we harbor some remaining doubts about the depth and consistency of Dortch's acceptance of responsibility and remorse. As mentioned previously, those feelings have not led Dortch to try to help Officer Cobb's family or to atone to the accomplices whom he enticed into joining his criminal plot. In addition, we are taken aback by the disingenuous and self-justifying statements that Dortch made, admittedly some years ago, in moving to withdraw his guilty plea and in applying to law school—for instance, Dortch's characterization of his own conviction as an "abortion of justice."

The last two *Manville* factors—the applicant's constructive activities and accomplishments subsequent to the criminal convictions and the opinions of character witnesses about the applicant's moral fitness—both count in Dortch's favor. We are impressed with the duration and consistency of Dortch's post-incarceration ef-

---

11.  The Committee stated:
  The record is replete with statements, both from Mr. Dortch and witnesses, reflecting Mr. Dortch's concurrent contrition, remorse, and acceptance of responsibility for his criminal behavior.... Mr. Dortch even concluded that the nature of his crime mandated that he spend a substantial amount of time in prison. He did not want it said that he "got off with a slap on [his] wrist." ... During his testimony before the Committee, Mr. Dortch appeared sincere in expressing remorse and in accepting responsibility for his criminal actions.
  (Citations to the record omitted.)

forts to rehabilitate himself and to make a positive contribution to the community through public service activities and otherwise. We likewise are impressed with the character references that Dortch has garnered from a large number of thoughtful and responsible persons who have gotten to know him and who believe he has genuinely reformed.

As with any multi-factor, "totality of the circumstances" inquiry, the challenge comes at the end, when we must weigh and balance the factors against each other. "[O]ur decisions reflect the difficulty of determining what 'proof of the requisite rehabilitation following conviction of a serious crime' will suffice to justify admission." *In re Kleppin*, 768 A.2d 1010, 1011 (D.C. 2001) (quoting *In re Polin*, 630 A.2d 1140, 1141 (D.C.1993)). "[T]here is no litmus test" for good moral character, *Manville I*, 494 A.2d at 1297 (internal quotation marks and citation omitted), nor any rule that prescribes how much weight each factor is to be assigned. Ultimately, the balancing is committed to our honest discretion and rational good judgment.

We possess no supernatural ability to look into an applicant's heart. Rather, we must divine what we need to know from the applicant's actions and outward manifestations. Some actions and outward manifestations are more revealing, and more probative, than others. So it is with acts of moral turpitude such as the crimes committed by Dortch. Given the "extremely damning" character of his crimes, it was incumbent on Dortch to make an exceptionally compelling showing of his full and complete rehabilitation in order to assure us of his present good moral character. We do not perceive that Dortch has made so compelling a showing. As we have seen, the *Manville* factors cut both ways in his case. Even Dortch's post-conviction efforts to rehabilitate himself,

while commendable, have not been extraordinary enough to "demonstrate a reformation of character so convincingly that it is proper to allow admission to a profession whose members must stand free from all suspicion." *Matthews*, 462 A.2d at 176. We do not have before us a substantial record of personal sacrifice, outstanding service to others, or similar expiative and ethical behavior on Dortch's part that would tend to confirm his indisputable moral regeneration. To the contrary, Dortch's failure to make restitution—to offer help, for example, to Officer Cobb's surviving family—seriously undermines his claim that he is fully rehabilitated. We remain uneasy, too, over some of the statements that Dortch has made in the years since his conviction. Perhaps we would reach a different conclusion, as we did on a comparable showing in *Manville I* and *II*, if the standard of proof were merely a preponderance of the evidence. But viewed in its entirety, the proof of Dortch's good moral character is not clear and convincing; the evidence is too equivocal to produce in our minds the necessary firm belief or conviction that Dortch is a new, totally rehabilitated man.

### C. The Question of "Fitness"

██ The majority of the Committee on Admissions recommended that Dortch's application be denied, without reaching the question of his current moral character, on the threshold ground that he is still on parole. The fact that Dortch is still on parole does not, in itself, mean that he has not reformed. If anything, the Parole Commission's decision to release him from supervision is a sign of official confidence in his rehabilitation. As we see it, therefore, Dortch's continuing parole status is not something that impeaches his present moral character. The issue is whether it calls into question Dortch's general fitness to practice law for other reasons. We

think it does. We conclude that so long as Dortch is on parole, he cannot demonstrate by clear and convincing evidence that he is fit to assume the responsibilities and be accorded the privileges of an officer of the court.

Parole is a continuation of an offender's sentence; it is "a state of conditioned liberty; a prison without walls." *Walgren,* 708 P.2d at 387; *accord, Allen v. District of Columbia Hackers' License Appeal Bd.,* 471 A.2d 271, 274 (D.C.1984). Parolees are subject to ongoing official oversight and supervision, restrictions on their activities, and reincarceration for violating the conditions of their release. They remain subject to various civil disabilities as well. In the District of Columbia and elsewhere, for example, a person on parole for a felony offense is disqualified from serving as a juror. D.C.Code § 11–1906(b)(2)(B) (2001); *see Carle v. United States,* 705 A.2d 682, 684–86 (D.C.1998). This disqualification exists to assure the "probity" of the jury. *See id.* at 686.

This court has not had occasion before now to address whether a person who is still serving a criminal sentence, either on parole or otherwise, is disqualified by virtue of that fact from being admitted or reinstated to our Bar.[12] A few other courts have addressed that question, however. As previously mentioned, the Court of Appeals of Maryland held in Dortch's very case that "a candidate for admission to the Maryland Bar who has been convicted of a crime that would clearly necessitate disbarment must have, as a threshold requirement, at least served his or her sentence and must have been released from parole supervision for the offense before this court will even consider his or her application." *Dortch,* 687 A.2d at 245. Most other courts that have confronted this issue—typically in connection with petitions for reinstatement—have agreed that discharge from parole (or probation) is a precondition to admission to the bar. *See In re Culpepper,* 770 F.Supp. 366, 374 (E.D.Mich.1991); *In re Walgren,* 104 Wash.2d 557, 708 P.2d 380, 387–88 (1985); *In re Griffin,* 101 N.M. 1, 677 P.2d 614 (1983); *In re Lida,* 211 A.D.2d 255, 627 N.Y.S.2d 688, 689 (N.Y.App.Div.1995); *State Grievance Comm. v. Hochberg,* 1999 Conn.Super. Lexis 1979 *9 (Conn.Super.Ct.1999).[13]

■■ We are in agreement with the holding of Maryland's highest court, among other courts, and with the views expressed by the majority of our Admissions Committee. There is a fundamental and glaring incompatibility between serving a criminal sentence and serving as an agent of law and justice. We think that the public expects, and has every right to expect, that serious violators of the law must fulfill their obligations to society honorably and entirely by (at a minimum)

---

**12.** In two disciplinary cases involving facts and circumstances vastly different from those of the instant case, this Court countenanced the continued practice of law by attorneys who were on probation for criminal offenses. *See In re Hoare,* 727 A.2d 316 (D.C.1999); *In re Reynolds,* 649 A.2d 818 (D.C.1994). In neither case did we consider the import of the attorney's status as a probationer, however.

**13.** The Supreme Court of Minnesota has declined to adopt an absolute rule but has said that final discharge from parole status "should ordinarily precede" an application.

*Thompson,* 365 N.W.2d at 265. The court added that "[a]bsent final discharge, there must be a showing ... that the petitioner has complied with the conditions of parole for a period of time sufficient, given the gravity of the crime for which the petitioner was convicted, to warrant an inference that the petitioner is reliable and trustworthy and will not violate the law." *Id.* This formulation seems to us to focus too narrowly on the applicant's moral character to the exclusion of other aspects of the fitness inquiry.

completing their own sentences before they seek the imprimatur of this court to "aid in the administration of justice" as attorneys and officers of the court. D.C.Bar. R. XI, § 2(a). To disregard that expectation would jeopardize the trust that clients, adversaries, lawyers, judges, and the public at large are asked to repose in members of the Bar as exemplars of high moral and ethical standards. It also would depreciate the gravity with which felony violations of law are viewed. Moreover, we have some concern that the disabilities and constraints associated with the status of parole might tend to strain the allegiance of an attorney who is still on parole to the justice system. To preserve public confidence in the probity of the Bar and respect for the rule of law, therefore, we think it reasonable to insist that an officer of the court not be someone who is serving a sentence imposed by the court for a crime of moral turpitude. For that reason, we hold that applicants for admission to the Bar of this Court who have been convicted of such crimes must have finished serving their sentences, including any parole terms, before they can be found fit to engage in the practice of law.

Because Dortch received concurrent life sentences for the offenses of murder and attempted armed robbery, our holding means that we will not entertain his application for admission to our Bar unless and until he is pardoned or his sentences are commuted.

## III. CONCLUSION

For the foregoing reasons, we conclude that John Curtis Dortch has not demonstrated and cannot now demonstrate by clear and convincing evidence that he possesses the requisite good moral character and general fitness for admission to the Bar of this Court. In accordance with the unanimous recommendation of the Committee on Admissions, we deny Dortch's application for admission.

*So Ordered.*