276 P.3d 122 (2012)
Michael T. MIRANDA, Petitioner
v.
The PEOPLE of the State of Colorado, Respondent.
No. 10PDJ097.
Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.
April 17, 2012.

*123 OPINION AND DECISION GRANTING REINSTATEMENT PURSUANT TO C.R.C.P. 251.29

I. SUMMARY

On September 4, 2004, Petitioner drove his car while intoxicated, causing the death of Kristopher Mansfield, a United States Air Force veteran who had just returned from a tour of duty in Iraq. Petitioner was convicted of vehicular homicide/DUI and sentenced to eight years' incarceration, followed by five years of mandatory parole. His law license was also suspended for two years. Petitioner, who is now serving his parole sentence, has petitioned for reinstatement to the bar. Petitioner has proved by clear and convincing evidence his rehabilitation, his fitness to practice law, and his full compliance with all applicable disciplinary orders, and the Hearing Board thus concludes Petitioner's law license should be reinstated immediately.

II. PROCEDURAL HISTORY

Petitioner took the oath of admission and was admitted to the bar of the Colorado Supreme Court on October 14, 1994, under attorney registration number 24702. On April 14, 2006, the Colorado Supreme Court immediately suspended Petitioner from the practice of law without objection. A hearing board later suspended Petitioner from the practice of law for two years, effective August 10, 2007.
On September 17, 2010, more than three years after the effective date of his two-year suspension but while he was still in the custody *124 of the Department of Corrections, Petitioner filed with the PDJ a "Petition for Order of Reinstatement Pursuant to Rule 251.29, C.R.C.P." The People filed a motion to dismiss the petition on October 5, 2010, arguing that pursuant to C.R.S. § 18-1.3-401(3), Petitioner was not entitled to practice law while in the custody of the Department of Corrections. Petitioner filed a response to the People's motion on October 25, 2010.[1] On December 6, 2010, the PDJ denied the People's motion.
Petitioner was released from community corrections[2] on intensive supervised probation in March 2011. On November 30, 2011, Petitioner's sentence to confinement, incarceration, and probation was discharged, he was released from the custody of the Department of Corrections, and he was placed on mandatory parole under the supervision of the parole board. Based on his status as a parolee, Petitioner filed a motion in limine seeking to prohibit the People from arguing in the reinstatement hearing that he is legislatively barred from practicing law by operation of C.R.S. § 18-1.3-401(3). The PDJ granted Petitioner's motion but allowed the People to argue that Petitioner should not be reinstated because he is currently serving a parole sentence. The PDJ then denied another of Petitioner's motions in limine, filed February 3, 2012, to prohibit introduction of certain exhibits and testimony.
During the reinstatement hearing, the Hearing Board heard testimony from Petitioner, R.J. Driscoll, Dr. David Wahl, Jessica Lee, Emily Tompkins, Juliann Legg, and Craig Mansfield, and the PDJ admitted Petitioner's exhibits 1-17[3] and the People's exhibits A-C.

III. FINDINGS OF FACT

Petitioner's Conviction
In the early evening of September 4, 2004, Petitioner was driving his car northbound on South Colorado Boulevard, having traveled from his sister-in-law's house, where he had spent the afternoon alone watching a football game and consuming the equivalent of several gin and tonics.[4] When he decided to stop at a local grocery store on his way home, he turned left toward the store's parking lot and in front of oncoming traffic in the southbound lanes. As he executed the turn, a southbound motorcycle collided with the rear right panel of Petitioner's vehicle. The motorcycle was driven by Kristopher Mansfield ("Mansfield"), a twenty-three year-old senior airman with the United States Air Force who had recently returned from a tour of duty in Iraq.
After the impact, Petitioner pulled his vehicle into the parking lot out of the way of oncoming traffic, and then returned to check on Mansfield, supine in the roadway. Petitioner left Mansfield's side ten minutes later, when other people arrived to provide care, and was soon thereafter arrested at the scene. Denver police tested Petitioner's blood alcohol level from a blood sample. An initial test indicated Petitioner's blood alcohol content was 0.217, and a second test showed a blood alcohol content of 0.198.[5] Upon Petitioner's arrest, a restraining order was entered, prohibiting him from contacting Mansfield or his relatives.[6]
*125 Mansfield was taken to Denver Health Medical Center and was later pronounced dead at 4:45 p.m. on September 6, 2004. Of this awful tragedy Petitioner recalled, "I was so overwhelmed by grief and the loss of life and my role in it that I didn't sleep for the first four days [after the accident]. . . . I couldn't stop crying . . . I couldn't believe that I engaged in conduct that brought this kind of harm to another human being."
Petitioner testified that since September 4, 2004, he has abstained from consuming alcohol. Between October 2004 and September 2005, Petitioner sought treatment at Arapahoe House, an alcohol rehabilitation program, for anxiety, depressed mood, and feelings of guilt, remorse, and grief.[7] His treatment there included education about substance abuse, relapse and recidivism, and stress management.[8] Petitioner also joined Colorado Lawyers Helping Lawyers ("CLHL"), a peer support group for attorneys who experience problems with alcohol or substance abuse or suffer from mental health problems. Through CLHL, Petitioner was referred to Peer Assistance Services, Inc., where he received additional treatment beginning in February 2005.[9] During this period, Petitioner wound down his law practice, choosing not to accept new cases for fear he would not be able to complete work on those matters prior to conclusion of his own criminal case.[10]
On September 29, 2005, Petitioner entered a guilty plea to vehicular homicide/DUI, a class three felony, in violation of C.R.S. § 18-3-106(1)(b)(I).[11] On December 2, 2005, he was sentenced to eight years in the custody of the Department of Corrections and five years of mandatory parole.[12] He was taken into custody the same day.

Petitioner's Custody in the Department of Corrections
Petitioner was soon transferred from the Denver County Jail to Sterling Correctional Facility, where he was housed in a minimum security area from December 2005 through February 2008. He was assigned a forty-hour-a-week job teaching inmates who were studying for GED tests, and he volunteered one or two nights a week as a reading and writing tutor for inmates who were not proficient in English. On weekends, he assisted other inmates with their studies. Petitioner also regularly attended Alcoholics Anonymous ("AA") meetings.
During Petitioner's time at Sterling, his lawyer settled a suit brought against Petitioner by Mansfield's family for $1,000.000.00,[13] which subsumed a restitution order of $20,866.20 in Petitioner's criminal case.[14] Also around this time, the Colorado Supreme Court immediately suspended Respondent from the practice of law. The People then initiated the disciplinary case underlying this matter. After the PDJ granted the People's motion for judgment on the pleadings, a hearing board suspended Petitioner from the practice of law for two years, effective August 10, 2007. Petitioner appealed the sanction and sued for malpractice against the attorney who represented him in his disciplinary proceeding; as he explained, he believed he was required to appeal his disciplinary case if his professional negligence suit were to go forward. The case against his former counsel was ultimately dismissed.
In February 2008, Petitioner's application for placement in community corrections was denied, so he volunteered for transfer to the Cheyenne Mountain Reentry Center on the advice of his caseworker. On arrival, Petitioner found the facility chaotic and dangerous; he inured himself to these conditions by volunteering to work in the law library and attending AA and Narcotics Anonymous meetings almost every night.[15] As he recalled, *126 the meetings represented a "refuge" and an "escape from the chaos" of the center, but he also hoped the parole board would look at his attendance at these meetings as an indication that he was committed to change.
Following his transfer to Cheyenne Mountain Reentry Center, Petitioner initiated a lawsuit against Mothers Against Drunk Driving ("MADD") based on a letter MADD had submitted to the PDJ in Petitioner's disciplinary matter.[16] That suit, too, was dismissed, and Petitioner was ordered to pay MADD's attorney's fees and costs.[17] Following negotiation, MADD agreed to assume a portion of those fees. Emily Tompkins, current MADD State Executive Director, testified that Petitioner's lawsuit had a significant financial and emotional impact on MADD: the several-thousand dollars MADD spent in defending against Petitioner's claims would have gone "a long way" to advance that organization's mission, and the lawsuit caused volunteers to fear they might be subjected to legal action for "going about their daily business" of serving victims of drunk driving.
Petitioner was transferred in August 2008 to the Cañon Minimum Centers' Skyline Camp in Cañon City, where he held the position of inmate representative.[18] Petitioner testified that he volunteered in the library at Skyline and taught life skills to other inmates at the facility. On August 20, 2010, Petitioner was released from incarceration and assigned as a resident-inmate to Arapahoe County Community Corrections. Almost immediately, he began work during the week at an architectural firm owned by a family member, spending time on the weekends reconnecting with his family and performing upkeep on their investment properties. In the fall of 2010, Petitioner attended, at the recommendation of his caseworker, a drunk driving impact panel sponsored by MADD,[19] a responsible driving seminar,[20] and a series of relapse prevention classes.[21] Also around that time, he again began attending weekly one-hour CLHL meetings,[22] where he now "shares [his] story" and tries, in a non-judgmental way, to help other attorneys who face difficult circumstances. Since August 2010, Petitioner has regularly submitted to random drug screens and urinalysis monitoring tests, none of which have yielded a positive result.[23]
Petitioner was discharged from community corrections on intensive supervised probation in March 2011. Since then, he has found employment as a paralegal with several lawyers, including R.J. Driscoll ("Driscoll") and his attorney in this matter, David C. Japha. He has continued to look after his family's investment properties during evenings and weekends and to perform maintenance on his own home in anticipation of selling it. Petitioner also attests that he has signed up to volunteer for Habitat for Humanity, although he has not yet begun to work for that organization. On November 30, 2011, Petitioner's sentence to confinement was discharged, he was released from custody of the Department of Corrections, and he began serving his mandatory parole sentence.

Mandatory Parole Sentence
Petitioner is now serving a five-year mandatory parole sentence, which is slated to run through November 20, 2016, less earned time, if any. As a parolee, Respondent's freedom of movement and association are somewhat circumscribed. Jessica Lee ("Lee"), Respondent's parole officer, explained that Respondent may travel freely within the Denver metropolitan areaalthough he may not operate a motor vehiclebut he must seek Lee's permission to travel outside those boundaries and secure her written authorization to cross state lines. Petitioner is required to undergo monthly urinalysis testing, he must abstain from alcohol *127 consumption, and he is expected to obtain a sponsor whom he can contact for support and guidance.
But most germane to Petitioner's desire to again practice law is the prohibition against his unapproved association with anyone who has been charged with a crimeincluding felonies, misdemeanors, and municipal code violations. As Petitioner's parole order makes clear, he "must submit the names and dates of birth of any person [he] would like to associate with"; he bears the burden of asking each such person whether or not he or she has been charged with a crime and seeking Lee's permission to associate with those who have.[24] Lee testified that she and her supervisors interpret this directive as requiring her approval of Petitioner's interactions with any potential client who has been charged with a crime, whether that potential client is seeking legal counsel in a civil or a criminal matter. Lee also explained that failure to adhere to these conditions of parole could result in a range of penalties, including reprimand, loss of earned time, and revocation of parole.
Lee testified that to date, Petitioner has complied with all conditions governing his parole sentence and has been placed on the lowest level of supervision. She also noted that Petitioner may be eligible for early termination of his parole sentence, which he could seek after two-and-a-half years[25] if he continues to adhere to his parole conditions.

Petitioner's Psychiatric and Medical Condition
In anticipation of his reinstatement hearing, Petitioner requested that Dr. David Wahl ("Wahl") independently evaluate his psychiatric and medical condition and opine as to his fitness to practice law. As Wahl testified, he interviewed Petitioner twice, each time for forty-five minutes, in order to discuss his conviction, incarceration, physical condition, and relationship with alcohol.
According to Wahl's diagnosis, Petitioner is in stable remission from alcohol abuse, a condition characterized by periods of intoxication that do not result in addiction. Wahl distinguished alcohol abuse from alcoholism, a condition that is chronic and requires constant monitoring and vigilance. As Wahl opines in a report he drafted at Petitioner's request, Petitioner's "abuse of alcohol was closely linked to situational drinking, and did not rise to the level of creating an alcohol dependency."[26] Wahl also adjudges Petitioner to have "minimal risk of relapse in his sobriety," given his "solid record of abstinence and excellent understanding of his past diagnosis, and risks therein."[27] Although Wahl suggests in his report that Petitioner "seek a brief course of individual psychotherapy to address and resolve continuing minor symptoms lingering from the tragedy of 2004,"[28] he also testified that, in his opinion, Petitioner is sufficiently rehabilitated from alcohol abuse and symptoms of post-traumatic stress disorder such that he is fit to practice law.
For his part, Petitioner recounted how he began to drink heavily several years prior to the accident, after his mother passed away. He started frequently visiting his father, who lived alone, and they would drink together over dinner. When his father died in 2001, Petitioner continued drinking alone, in part due to the "underlying sadness of losing [his] parents." Rather than learn how to grieve for his loss or seek appropriate tools to help him do so, he explained, he drank in order to feel the effects of alcohol. The accident led him to realize that he had allowed himself and his drinking habits "to go unchecked." Nevertheless, Respondent does not consider himself a recovering addict and does not believe the AA's twelve-step program applies to him, since "those are reserved for true alcoholics." He testified that he does not drink and has no desire to do so, but he is not "doing anything more than that" as a *128 preventive measure to address his diagnosis as an alcohol abuser.
Petitioner observed that his decision to drink and drive on September 4, 2004, was the "worst error of judgment" in his life, and the remorse and guilt he feels from causing Mansfield's death "has never left." Reflecting on the past eight years, he stated that he has "mustered all [his] strength" to get to where he is, recognizing that he "can't turn the clock back" but can "only go forward."
Petitioner explained that he seeks reinstatement to the practice of law because he loves the legal profession, he has learned from this experience, and he believes he will be a better lawyer for it. He noted that he reads legal periodicals, has kept abreast of legal developments, and has completed at least seventy-five hours of continuing legal education during his suspension.[29] Driscoll, for whom Petitioner has worked as a paralegal during his period of parole, praised Petitioner as an "earnest, gifted individual" who "works like a dog," is professionally competent, committed to his family, focused on decency in the law, and whose "cash-register honesty is meticulous." Driscoll stated that he harbors no reservations in recommending the Hearing Board reinstate Petitioner's law license.

IV. LEGAL ANALYSIS

As an attorney who has been suspended for a period of longer than one year, Petitioner must prove by clear and convincing evidence that he has been rehabilitated, is fit to practice law, and has complied with all applicable disciplinary orders and rules.[30] Because the People do not contest Petitioner's compliance with all applicable disciplinary orders, the Hearing Board focuses only on the first two factors.

Rehabilitation
Imposition of discipline upon an attorney includes a determination that some professional or personal shortcoming existed. The shortcoming may have resulted either from personal deficits exclusively or from a combination of personal deficits, professional deficits, and environmental challenges. The Hearing Board's analysis of rehabilitation is therefore directed to examining the shortcoming that resulted in Petitioner's suspension in order to ensure protection of the public welfare.
We are guided by the leading case of People v. Klein, which enumerates several considerations in evaluating whether an attorney has been rehabilitated and is thus qualified for reinstatement.[31] These factors are: character; conduct since the imposition of the original discipline; professional competence; candor and sincerity; recommendations of other witnesses; present business pursuits; personal and community service aspects of the petitioner's life; and recognition of the seriousness of the previous misconduct.[32] The Klein criteria provide a benchmark to assess whether an attorney has been rehabilitated[33] such that there is little likelihood the attorney will repeat in the future the misconduct that led to the attorney's suspension. Ultimately, each case for reinstatement must be reviewed on its own merits and must fail or succeed on the evidence presented and the circumstances peculiar to the case.[34]
In this matter, Petitioner's abuse of alcohol resulted in Mansfield's tragic and untimely death. Petitioner's personal shortcoming of alcohol abuse also led to his own incarceration and parole, a devastating period for Petitioner and his family. Since the accident, Petitioner has maintained sobriety, and he has sought substance abuse treatment and *129 professional and peer counseling to address his condition. The Hearing Board is persuaded by Wahl's expert opinion that Petitioner has been sufficiently rehabilitated from alcohol abuse to be reinstated to the practice of law; indeed, the People presented no evidence to counter or otherwise rebut Wahl's analysis. However, in light of Wahl's testimony that relapse is always a possibility, we are concerned Petitioner is not currently participating in an AA program or otherwise seeking treatment specifically related to his diagnosis. Accordingly, we conclude that as a condition of reinstatement, Petitioner must attend monthly AA meetings for the duration of his parole sentence.
We next turn to other Klein factors that bear heavily upon our determination in this matter: specifically, character; conduct since the imposition of the original discipline; candor and sincerity; and recognition of the seriousness of the previous misconduct. The People argue that Petitioner's failure to make amends to Mansfield's family evinces his lack of remorse, which in turn reflects poorly on his character, candor, and sincerity, and raises concerns that he may not recognize the seriousness of his misconduct. They also contend that Petitioner's lawsuits against both MADD and his former disciplinary counsel suggest he has not taken responsibility for his actions and instead lays the blame for his suspension at others' feet.
The Hearing Board does not adopt the People's interpretation of Petitioner's failure to contact Mansfield's family. Although efforts to make amendsand, indeed, any act of contritionwould have helped to demonstrate Petitioner's sincerity and a recognition of his error, we cannot find that he is deficient on those scores for failing to do that which he is, by court order, prohibited from doing. We likewise do not view Petitioner's suits against MADD and his former disciplinary counsel as a permanent bar to his reinstatement; after all, he filed complaints in those cases more than three years ago and, at the disciplinary hearing, he expressed a measure of remorse for instituting those cases. We will not reject indeterminately Petitioner's bid for reinstatement based on these immutable facts that he now regrets.
We are moved by the testimony proffered by Juliann Legg and Craig Mansfield, Mansfield's mother and father, which made clear the anguish they have suffered and the pain they will continue to endure for the rest of their lives. We consider their grief in making this very difficult decision. But we also bear in mind the adversity experienced by Petitioner's family and his own trying journey over the past seven years. Considering all these circumstances, the Hearing Board finds that Petitioner is truly remorseful for the harm he has caused the Mansfield family, his own family, and the legal profession. In light of Petitioner's own statements and the corroborating testimony offered by Driscoll and Wahl, we conclude Petitioner has confronted his alcohol abuse problem, has taken responsibility for his mistakes, is unlikely to drink and drive again, and has committed to reforming those deficits in his life that caused such profound misfortune.

Fitness to Practice Law
Whether an attorney seeking reinstatement of his or her law license is fit to practice law requires a broader analysis than the inquiry concerning rehabilitation. Even though a petitioning attorney may be rehabilitated from those events or conditions that precipitated the original discipline, other factors may yet indicate the attorney is not fit to practice law.
In this case, Petitioner's current work as a paralegal and his continuing legal education demonstrate that he is professionally competent to serve as an attorney. But the People argue that Petitioner's status as a parolee erects practical constraints and gives rise to public policy considerations that militate against finding he is fit to practice law. First, they contend parole directives limiting Petitioner's activities stand as intractable obstacles to his practice of law. Next, as a matter of public policy, they assert that allowing a parolee to hold a law license would undercut the public's trust and confidence in Colorado's legal system.
At the outset, the Hearing Board acknowledges that Petitioner's parole conditions will create some practical impediments to running an efficient legal practice. To be sure, *130 the prohibition against driving and the requirement that Petitioner seek permission to travel outside the Denver metropolitan area will force him to limit his case load and carefully plan his schedule. Even more significant, the proscription against associating with those who have been charged with criminal conduct may raise client conflict issues that cannot be waived. But rather than rejecting outright Petitioner's bid for reinstatement on those grounds, we conclude the better practice is to place conditions on his reinstatement, as we set forth more fully below, that are designed to protect the public.
We are also cognizant that some members of the public might find unseemly the reinstatement of a newly-paroled felon to membership in the bar. As the People argue, "the privilege of practicing law should not be extended when doing so will directly undermine the very integrity of the legal system."[35] Petitioner, on the other hand, counters that allowing him to establish a legal practice as a parolee will not be seen as a panoptic black mark on the profession. Rather, his status as parolee may simply inform individual clients' perception of his character and their decision to hire him for their legal work. Further, he says, his reinstatement would rightfully bring to an end his disciplinary suspensionwhich was set at two years but has stretched to almost fiveand signal the beginning of the restoration of his life in the legal community.
As the People observe, this is a matter of first impression: the Colorado Supreme Court has not addressed whether a parolee may properly be reinstated or readmitted to the practice of law. The People cite case law from sister jurisdictions rejecting parolees' applications for reinstatement, but we find those decisions factually distinguishable, inasmuch as the gravity of the applicants' criminal offenses in those cases reflects substantially more serious moral turpitude and thus represents a much larger hurdle to reinstatement.[36] And even though some jurisdictions do apply a per se rule excluding parolees from the practice of law,[37] the Hearing Board does not view Petitioner's status as a parolee as an insuperable obstacle to his reinstatement.[38] Instead, we conclude that the fact Petitioner is serving a parole sentence ought to be considered as but one element in the totality of the circumstances in order to determine whether his resumption of legal practice will be injurious to the public.
Here, considering that the purpose of the attorney regulation system is not to punish lawyers but to protect the public while allowing for the possibility of a lawyer's rehabilitation,[39] *131 our sense of fairness and proportionality dictate that Petitioner's application for reinstatement should be examined through the lens of public protection, rather than based on the results of his misconduct. In so doing, we find the public will be reasonably protected if Petitioner is reinstated. Petitioner has no other prior disciplinary offenses[40] and is unlikely to repeat his past mistakes. He has served his time, established that he has been rehabilitated, and demonstrated that he possesses the requisite legal abilities and training to again practice law. Thus, in the end, we see no cause to construct yet another barrier to Petitioner's reinstatement on public policy grounds when no governing authority in this jurisdiction has mandated such an approach.

Conclusion
In sum, Petitioner's testimony and the other evidence adduced at the hearing establish clearly and convincingly that Petitioner has been rehabilitated, is fit to practice law in the State of Colorado, has complied with all past court orders, and therefore should be reinstated to the practice of law, subject to the conditions outlined herein.

V. ORDER

1. The Hearing Board GRANTS the "Petition for Order of Reinstatement Pursuant to Rule 251.29, C.R.C.P.," filed by Petitioner MICHAEL T. MIRANDA, who SHALL be reinstated to the practice of law effective immediately, conditioned upon his compliance with the requirements set forth below.
2. Petitioner SHALL pay the costs of these proceedings. The People SHALL submit a statement of costs within fourteen days of the date of this order. Petitioner shall have seven days to file a response.
3. Petitioner SHALL comply with certain conditions of reinstatement. These conditions are:
A.) Petitioner shall successfully complete all conditions of his parole. Petitioner has the duty to notify the Office of Attorney Regulation Counsel within forty-eight hours if he violates any condition of his parole. Petitioner recognizes a failure to so notify the Office of Attorney Regulation Counsel will be considered a violation of this order and may result in significant discipline.
B.) Petitioner shall abstain from using alcohol or any other mood-altering substance (unless such substance was prescribed by a licensed Colorado physician before it was ingested), until his parole sentence is discharged. Petitioner has the duty to notify the Office of Attorney Regulation Counsel within forty-eight hours of any use of alcohol or any other mood-altering substance (unless such substance was prescribed by a licensed Colorado physician before it was ingested). Petitioner recognizes a failure to so notify the Office of Attorney Regulation Counsel will be considered a violation of this order and may result in significant discipline.
C.) Until Petitioner's parole sentence is discharged, he shall fully disclose in writing and discuss with all prospective clients his status as parolee and shall, upon the formation of any attorney-client relationships, obtain written informed consent from such clients confirming that he disclosed his status as parolee. Petitioner shall provide written confirmation of compliance with this condition on a quarterly basis to the Office of Attorney Regulation Counsel commencing on June 1, 2012.
D.) As recommended by Dr. David Wahl, Petitioner shall attend monthly counseling with a psychiatrist or a psychologist ("doctor") who is pre-approved *132 by the Office of Attorney Regulation Counsel. The counseling is intended to address and resolve lingering post-traumatic stress symptoms Petitioner continues to experience as a result of Mansfield's death. The monthly counseling shall continue until Petitioner's parole sentence is discharged, unless the doctor reports in writing to the Office of Attorney Regulation Counsel that such counseling is no longer required or can be modified or reduced. Petitioner shall execute an authorization for release, requiring the doctor to notify the Office of Attorney Regulation Counsel if Petitioner fails to participate in this required counseling, or if the doctor reasonably believes that Petitioner has failed to abstain from the use of alcohol or any other mood-altering substance (unless such substance was prescribed by a licensed Colorado physician before it was ingested).
E.) Petitioner shall attend AA meetings at least once a month until his parole sentence is discharged. Petitioner shall provide written confirmation of compliance with this condition on a quarterly basis to the Office of Attorney Regulation Counsel commencing on June 1, 2012.
F.) Petitioner shall consult monthly with a peer mentor selected by the Office of Attorney Regulation Counsel in conjunction with Petitioner. The mentoring is intended to assist Petitioner in his transition to the active practice of law and to account for the significant stressors associated therewith. The monthly mentoring shall continue until Petitioner's parole sentence is discharged, unless the peer mentor and the Office of Attorney Regulation Counsel jointly determine that such mentoring is no longer required or can be modified or reduced. Petitioner shall execute an authorization for release, requiring the mentor to notify the Office of Attorney Regulation Counsel if Petitioner fails to participate in this required mentoring, or if the mentor reasonably believes that Petitioner has failed to abstain from the use of alcohol or any other mood-altering substance (unless such substance was prescribed by a licensed Colorado physician before it was ingested). Petitioner shall provide written confirmation of compliance with this condition on a quarterly basis to the Office of Attorney Regulation Counsel commencing on June 1, 2012.
G.) Petitioner shall engage in fifty hours of community education and outreach by December 31, 2013, through public speaking or other volunteer opportunities to increase community awareness about the harms associated with excessive alcohol consumption and drunk driving. Such engagements must be pre-approved by the Office of Attorney Regulation Counsel.
NOTES
[1] In briefing the People's motion to dismiss, both Petitioner and the People agreed that Petitioner remained in the custody of the Department of Corrections up until the time he began serving his mandatory parole sentence.
[2] Community corrections is a community-based supervision program that provides "residential or nonresidential services for offenders, monitoring of the activities of offenders, oversight of victim restitution and community service by offenders, programs and services to aid offenders in obtaining and holding regular employment,. . . and such other services and programs as may be appropriate to aid in offender rehabilitation and public safety." C.R.S. § 17-27-102.
[3] The People stipulated to the admission of all but exhibits 2 and 17.
[4] Petitioner testified he consumed approximately six to eight ounces of gin before getting into his car.
[5] At the time of the accident, a blood alcohol content of 0.10 was the threshold level in Colorado for the criminal charge of driving under the influence of alcohol.
[6] As Petitioner explained, this order converted upon his conviction into a no-contact order, which remains in effect today. The People did not contest Petitioner's characterization of this restraint.
[7] Ex. 1.
[8] Id.
[9] Ex. 2.
[10] Ex. 1.
[11] Ex. C.
[12] Id.
[13] Ex. 9.
[14] Ex. C.
[15] Exs. 4-6.
[16] Ex. A.
[17] Id.
[18] Ex. 8.
[19] Ex. 11.
[20] Ex. 12.
[21] Ex. 14.
[22] Ex. 15.
[23] Exs. 10, 13.
[24] Ex. B at attachment G.
[25] Lee mentioned that this period might be further reduced by earned time of ten days per month served.
[26] Ex. 16.
[27] Id.
[28] Id.
[29] Ex. 17.
[30] C.R.C.P. 251.29(b).
[31] 756 P.2d 1013, 1015-16 (Colo.1988) (interpreting language of C.R.C.P. 241.22, which embodied an earlier version of the rule governing readmission to the bar).
[32] Id. at 1016.
[33] Rehabilitation has been defined as "the reestablishment of the reputation of a person by his or her restoration to a useful and constructive place in society." In re Cason, 249 Ga. 806, 294 S.E.2d 520, 522-23 (1982).
[34] See In re Cantrell, 785 P.2d 312, 314 (Okla. 1989).
[35] People's Hr'g Br. at 6.
[36] See In re Dortch, 860 A.2d 346, 359, 363 (D.C.2004) (denying readmission to parolee serving time for murder and attempted armed robbery); In re Pierce, 919 P.2d 422, 423 (Okla. 1996) (denying reinstatement to parolee who was convicted of eleven drug-related felony charges, including distribution of controlled substances and possession of a firearm while committing a felony, and who presented no evidence corroborating his claims of abstinence from drug use); In re McWhorter, 449 Mich. 130, 534 N.W.2d 480, 481-82 (1995) (denying reinstatement to applicant convicted of state offenses of kidnapping and conspiracy to kidnap and federal offenses of aiding and abetting the manufacture of methamphetamines, conspiracy to import cocaine into the United States, and conspiracy to manufacture, to possess with intent to distribute, and to distribute methamphetamines); In re Thompson, 365 N.W.2d 262, 264 (Minn.1985) (denying reinstatement to applicant who was convicted of the first-degree murder of his wife and who, after release from incarceration, engaged in questionable financial dealings).
[37] See, e.g., In re Lazcano, 223 Ariz. 280, 222 P.3d 896, 900 (2010) ("Today, though, we hold that an applicant currently on a felony deferred adjudication who remains under court supervision may not be admitted to practice law until the period of supervision has ended."); Dortch, 860 A.2d at 362-63 ("There is a fundamental and glaring incompatibility between serving a criminal sentence and serving as an agent of law and justice.") (internal citations omitted); In re Culpepper, 770 F.Supp. 366, 374 (E.D.Mich. 1991) (agreeing that "[r]einstatement prior to the elapse of parole would not comport with the principle that a parolee is not to be accorded complete liberty and privilege prior to successful completion of parole") (quotations omitted); In re Walgren, 104 Wash.2d 557, 708 P.2d 380, 387-88 (1985) ("We hold attorneys will not be reinstated into the Bar until they have successfully completed the conditions of their parole and have been finally discharged.").
[38] Accord Thompson, 365 N.W.2d at 265 (noting that final discharge from parole is not a prerequisite for readmission to the bar).
[39] In re Cardwell, 50 P.3d 897, 904 (Colo.2002); see also In re Price, 18 P.3d 185, 192 (Colo.2001) (noting that disciplinary proceedings are not punishment, nor are reinstatement proceedings intended as discipline).
[40] C.R.C.P. 251.29(e).